**J. DOE, Plaintiff,**

v.

**Alvaro RAFAEL SARAVIA; and Does 1–10, inclusive, Defendants.**

**No. CIV–F–03–6249.**

United States District Court, E.D. California.

Nov. 24, 2004.

1114

Nicholas W. Van Aelstyn, Heller, Ehrman, White and McAuliffe, Matthew James Eisenbrandt, Center for Justice and Accountability, San Francisco, CA, Carolyn Patty Blum, Pro Hac Vice, Law Office of Carolyn Blum, New York, NY, for plaintiff.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW *

WANGER, District Judge.

### FINDINGS OF FACT

1. [REDACTED]

2. Pursuant to Order of the Court dated September 18, 2003, for good cause shown, Plaintiff has brought this case under the pseudonym J. Doe.

3. [REDACTED]

4. Plaintiff justifiably believes that El Salvador remains an extremely dangerous country and that if his role in bringing this case were widely known, he would be in danger.

5. The Plaintiff justifiably believes that he could not bring this case in the Courts of El Salvador, because no criminal investigation and prosecution were ever completed to identify the perpetrators of the assassination of Archbishop Romero. Further, based on the grant of amnesty to perpetrators, continuing unreliability of the Courts of El Salvador, including demonstrated hostility to imposing legal responsibility for the assassination of Archbishop Romero, Plaintiff justifiably believes that a fair and impartial hearing could not be received in the Courts of El Salvador.

6. The Plaintiff in good faith believes that he and his family, through the present time, may be subject to attacks for his role in this case and would not have brought the case except under the privilege of anonymity.

7. Plaintiff acknowledges that conditions have changed to the extent that his attorneys could meet with witnesses, who testified at trial in the United States, and gathered evidence which, in earlier years before the end of the civil war, was not possible.

8. Defendant Alvaro Rafael Saravia, a Salvadoran citizen, was born on February 16, 1946. Criminal Complaint, *U.S. v. Alvaro Rafael Saravia Merino*, 87–03598–CIV (S.D.Fla. Nov. 25, 1987), and supporting affidavit of Sharon L. Kegerreis, ¶ 5; Complaint for Extrajudicial Killing and Crimes Against Humanity, filed 9/12/03 ("Complaint"), ¶ 4. Saravia previously served as a captain in the Salvadoran Air Force. In 1979, he was separated from

---

* Editor's Note: Redacted Version—Not Filed Under Seal

the Salvadoran military, and from that time worked closely with Major Roberto D'Aubuisson.

9. D'Aubuisson, at the direction of and in conjunction with elements of the Salvadoran armed forces and land-owning Salvadoran civilians inside and outside of El Salvador, founded the political movement Frente Amplio Nacional (the "FAN") and the political party Alianza Republicana Nacionalista ("ARENA"), and organized "escuadrones de la muerte," or "death squads," paramilitary organizations composed of military personnel and civilians who systematically carried out politically-motivated assassinations and other human rights abuses in El Salvador. Complaint ¶¶ 4, 11–13. Saravia was an active member of these death squads and held the position of "chief of security" for Robert D'Aubuisson in 1980. *Id.;* Hr'g. Tr. 8/27/04 (Karl) 89:4–10.[1]

10. Saravia was resident in Modesto, California, in the Fresno Division of the Eastern Judicial District of California at the time this suit was filed. He continues to receive mail at 2401 Manor Oak Drive, Modesto, California 95355, and was served with process there. Proof of Service, filed January 9, 2004.

11. Public records connect Defendant, by his date of birth, to that address, and establish that Defendant is the same Alvaro Rafael Saravia, who was sought to be extradited by the U.S. Government to El Salvador in 1987–1988 to face charges, later dismissed, of his complicity in the assassination of Archbishop Romero. *See* Declaration of Lecia Smith, and Ex. A, filed 9/2/04 ("Smith Decl."). These records link Defendant to an earlier Florida address and a Social Security Number issued in Florida in 1985–1986. *Id.; see also*

Supplemental Declaration of Mary Beth Kaufman, filed 9/2/04 ("Kaufman Decl.").

12. On September 12, 2003, Plaintiff filed a complaint against Saravia for violations of the Alien Tort Claims Act ("ATCA"), 28 U.S.C. § 1350, and the Torture Victim Protection Act ("TVPA"), Pub.L. No. 102–256 (1992) (codified at 28 U.S.C. § 1350, note) for his role in the March 24, 1980 assassination of Archbishop Romero in San Salvador, El Salvador.

13. Substitute service was effected on September 15, 2003, and October 18, 2003, by leaving a copy of the papers with Ines Olsson, the owner of 2401 Manor Oak Drive, Modesto, California 95355, the address at which Saravia was or had been residing and at which he was and is continuing to receive mail. The registered process server who served the Summons, Complaint and related papers, explained the general nature of the papers to Ms. Olsson at the time of personal service. Thereafter the papers were mailed on October 21, 2003, by a registered process server in the United States mail to Saravia at that address.

14. As of January 7, 2004, Defendant held recorded fictitious business names for Alo Fashion, Aquarius Enterprises, in the name of Alvaro Saravia, listing his business address as 2401 Manor Oak Drive, Modesto, California 95353. Personal records showed Defendant's listing of the same address as his address since at least 1997.

15. In a December 16, 2003, conversation, Ms. Olsson told M.B. Kaufman, a fellow and attorney for the Center for Justice and Accountability, that Alvaro Saravia had moved to Modesto in 1990, after conversations with Ms. Olsson and

---

**1.** All citations to the transcript of the evidentiary hearing on Plaintiff's Application for a Default Judgment are to the preliminary version; the final transcript was not yet available at the time of filing.

that Ms. Olsson "knew Mr. Saravia had been in the Air Force in El Salvador."

16. The Court entered Saravia's default by Order of the Clerk dated April 13, 2004.

17. Plaintiff applied for default judgment by the Court. In support of the application, Plaintiff filed declarations from numerous witnesses and presented live testimony at an evidentiary hearing held in open court on August 24–27 and September 3, 2004. The witnesses testifying at the hearing included The Reverend Canon William L. Wipfler, Ph.D.; Bishop Thomas J. Gumbleton; Amado Antonio Garay; Ambassador Robert White (by videotape deposition); Judge Atilio Ramirez Amaya; Professor Terry Lynn Karl; Maria Julia Hernandez; Father Jon Cortina, S.J.; Esther del Carmen Chavez Mancia; Francisco Acosta Arevalo; Father Walter Guerra; and Professor Naomi Roht–Arriaza.

## III. *FACTUAL BACKGROUND: THE ROOTS OF THE CONFLICT IN EL SALVADOR*

### A. *COUNTRY BACKGROUND*

18. The recent history of El Salvador has been defined by the concentration of the vast majority of land in the hands of a small group of wealthy landowners. This group is colloquially referred to s the "14 families," signifying that a small number of people hold great wealth and political influence in the country. Hr'g. Tr. 8/26/04 (Karl), 3:12–25; Ex. 98, March 15, 1993 Report of the United Nations Commission on the Truth in El Salvador ("TC Report") (Ex. 98), pp. 132–33.

19. Peasants and workers were constantly attacked in order to prevent them from organizing. These attacks culminated in a massacre in 1932 with more than 30,000 killed by military forces aligned with the landowners. This led to the imposition of a military regime that remained in power for more than 50 years, the longest military regime in the history of Latin America. Hr'g Tr. 8/26/04 (Karl), 2:6–25; TC Report, pp. 132–33.

20. A *de facto* alliance between the military and the oligarchs strengthened the oligarchs' grip on power. The military located their barracks on the property of these landowners and thereby controlled peasants and workers by repressing any opportunities for organization. By protecting their land and keeping the workers under control, the military served the landowner's interests opposing land reform. Hr'g Tr. 8/26/04 (Karl), 3:18, 4:1–25; TC Report, pp. 132–33.

21. The armed forces of El Salvador included an army and three security forces: the National Guard, the National Police and the Treasury Police. These three forces operated under the orders of the High Command but simultaneously served the landowners. The National Guard was traditionally the body of the security forces with the greatest presence in rural areas. Hr'g Tr. 8/26/04 (Karl), 16:1–25.

### B. *The Rise of Paramilitary Forces.*

22. In 1969 El Salvador went to war against Honduras in a border conflict better known as the "soccer war." Closing the borders eliminated a "safety valve" for Salvadorans unable to find work on the farms or in factories. This increased the pressure for land reform and the already extensive strength of the military and security forces. Hr'g Tr. 8/26/04 (Karl), 3:1–15; 6:19–7:21.

23. In response to new attempts by Salvadoran peasants to organize during the sixties and the emergence of some reformists within the military who favored land reform, the security forces created paramilitary groups to operate in rural areas. One of the main paramilitary

groups was known as ORDEN. Colonel Jose Alberto Medrano, the former head of the National Guard, was the founder of ORDEN and oversaw more than 80,000 members, mostly civilians, throughout the country. Medrano also created the National Intelligence Agency of El Salvador (ANSESAL). Hr'g Tr. 8/26/04 (Karl), 3:18, 17:1–25, 22:1–25, 23:1–25; TC Report, p. 133.

24. By 1979, the security forces and ORDEN had thoroughly consolidated their power, sowing terror among the civilian population. Not only were workers, peasants and priests targeted, teachers, union leaders, doctors, and other professionals were brutally repressed. Hr'g Tr. 8/26/04 (Karl), 68:1–25; TC Report, p. 133.

C. *The Emergence of Liberation Theology.*

25. During the same time, the Catholic Church underwent a major transformation after a conference of bishops in Medellin, Columbia, S.A., in 1969, at which it was decreed that the church should focus on the needs of the poor. Because the Catholic Church had traditionally been aligned with the oligarchy in El Salvador, this new interpretation of theology, known as "Liberation Theology," was a significant change. Hr'g Tr. 8/26/04 (Cortina), 95:16–25.

26. Priests all over El Salvador began to engage in projects to support poorer communities. The oligarchy and sympathetic military leaders considered Liberation Theology to be a front for Marxism. Starting in at least 1977, priests and lay Catholic workers became targets of repression. The World Anticommunist League and its regional body, the Confederation of Latin American Anti–Communists (CAL), approved resolutions condemning priests and establishing groups to monitor their activities. Hr'g Tr. 8/26/04

(Karl), 67:1–25, 68:1–25, 69:1–25, 70:1–25, 71:1–25, 72:1–25.

27. On February 22, 1977, Oscar Romero, then bishop of San Miguel, was elevated to Archbishop of San Salvador. At that time he was known for his moderate traditional views. On March 12, 1977, Father Rutilio Grande, a Jesuit priest, was murdered in the town of Aguilares. (Aguilares provided an example of the implementation of Liberation Theology, where community members, with the help of Father Grande and others, established Christian Base Communities). Father Grande was a close and important friend of Archbishop Romero. After the murder, Romero realized that Father Grande was targeted simply because he wanted to improve the deplorable condition of the poor in El Salvador. The steadily increasing human rights abuses against poor civilians and members of the church changed Romero's views on the role of the church in El Salvador. Hr'g Tr. 8/26/04 (Karl), 71:1–73:25; Hr'g Tr. 8/26/04 (Cortina), 88:1–89:25.

D. *Coup and Violent Backlash.*

28. In October 1979 a coup was carried out by younger reformist military officers led by Colonel Adolfo Majano. The new Revolutionary Governing Junta promised democracy and land reform, decreed the dismantling of ANSESAL and ORDEN, and briefly jailed some of the most notorious repressive figures in the military. Hr'g Tr. 8/26/04 (Karl), 55:21–56:25.

29. The coup resulted in a new period of violence. Various groups vied for control of the repressive apparatus. A core of military officers sought to block any reform. They considered the Junta to be infiltrated by reformers. One of the leaders·of this faction was former Major Roberto D'Aubuisson, who up until 1979 had been third in command of ANSESAL and

had secreted away many of the agency's archives. D'Aubuisson began organizing death squads as early as 1977, but intensified his efforts after the coup. The group of military officers he led performed widespread and brutal abductions and murders throughout the late 1970s and early 1980s. TC Report, p. 133–34.

30. Major D'Aubuisson drew considerable support from wealthy civilians who feared that their lands and business interests would be adversely affected by the reform program announced by the Junta. They were convinced that the country faced a serious threat of Marxist insurrection which they needed to overcome. Some of the richest landowners and businessmen inside and outside the country offered their estates, homes, vehicles, and bodyguards to help the death squads. They also provided the funds used to organize and maintain the squads, especially those directed by Major D'Aubuisson. TC Report, p. 134.

31. Saravia was "[o]ne of the principal lieutenants of D'Aubuisson" and was widely known to be D'Aubuisson's "Chief of Security" after both were cashiered from the Salvadoran military. Hr'g Tr. 8/27/04 (Karl), 122:15–17; Hr'g Tr. 8/24/04 (White), White Dep. 34:4–5.

E. *Romero's Increasingly Vocal Criticism.*

32. During this time Archbishop Romero showed a profound interest in and sympathy for the needs of poor Salvadorans. He used his position as Archbishop to address the repression in the country. In his weekly Sunday homilies he denounced the human rights abuses occurring throughout El Salvador. Often his homilies were the only public source of information about these abuses, identifying victims of violence and victims who "disappeared." He explicitly denounced the military and members of the security forces for their repressive actions. His homilies were broadcast throughout the country and millions of Salvadorans listened to them regularly. Hr'g Tr. 8/26/04 (Cortina), 98:23–25, 99:20–100:2; Hr'g Tr. 8/27/04 (Guerra), 57:1–58:25.

33. On March 23, 1980, Archbishop Romero delivered his most decisive homily. After weeks of increasing repression, Archbishop Romero declared, "No soldier is obliged to obey an order counter to the law of God." He continued, "In the name of God, then, and in the name of this suffering people, whose cries rise to heaven each day more tumultuous, I beseech you, I beg you, I order you, in the name of God, stop the repression?" Ex. 92 (March 23 homily); Hr'g Tr. 8/24/04 (Wipfler), 64:3–65:16.

IV. *ASSASSINATION OF ARCHBISHOP ROMERO*

A. *The Assassination.*

34. On March 24, 1980, Major D'Aubuisson, Saravia and others gathered at the home of a D'Aubuisson supporter in San Salvador. The group had knowledge that Archbishop Romero would celebrate a mass that day. A member of the group proposed that this provided a good opportunity to carry out the already approved assassination. D'Aubuisson agreed, and the group began to make arrangements. Saravia took charge of the operation and was involved in paying the fees of the assassin. Complaint, ¶¶ 15, 19; TC Report, pp. 127–131; Ex. 99, Inter–American Commission on Human Rights Decision ("IACHR Decision"), ¶¶ 3, 20, 43, 54, 54 (*citing with approval* the findings of the TC Report).

35. Amado Garay testified that early that evening, Saravia was at home when he instructed his driver, Garay, to drive him to a house with distinctive Japanese Maronon trees in front. Saravia, along with two members of the National Police, Nel-

son Morales, and Nelson Garcia, who had previously recruited Garay to work for Saravia, and another person also drove to the house. Hr'g Tr. 8/24/04 (Garay), 103:22–104:23; TC Report, pp. 127, 130, 131.

36. Garay waited by the gate of the house while Saravia went into the house. Saravia later emerged accompanied by a tall man with a beard. Saravia told Garay to drive the bearded man to an undisclosed location, and told him that the man would give him directions. Hr'g Tr. 8/24/04 (Garay), 105:11–106:5; TC Report, pp. 127, 130, 131.

37. Saravia said to the tall, bearded man, in Garay's presence, "It [is] better to shoot in the head because maybe he have [sic] a bulletproof vest. You have to be sure he got [sic] killed." Saravia also informed Garay that they would be provided with protection, as a vehicle would drive behind him. Hr'g Tr. 8/24/04 (Garay), 106:7–16.

38. Saravia directed Garay to get into a red Volkswagen to drive the tall, bearded man. The man had a long rifle with a telescopic lens. Garay followed the directions of the man, who spoke with a Salvadoran accent, to a location with a big gate followed by a long path. Complaint, ¶ 16; Hr'g Tr. 8/24/04 (Garay), 106:13–14; 20–23; 107:1–2; 111:12–13; 112:16; TC Report, pp. 127, 130–131.

39. During the ride, while Garay drove, the bearded man said, "I can't believe it, I'm going to shoot a priest." Hr'g Tr. 8/24/04 (Garay), 112:3–4.

40. The man directed Garay to stop at the front door of a church, which was identified by eyewitnesses as the chapel of the Hospital of Divine Providence. Garay saw people sitting in the pews of the church and a priest—whose identity was unknown to him at the time—speaking. The priest was Archbishop Romero, who was celebrating a mass in memory of Sara Meardi de Pinto, the mother of Jorge Pinto, a friend of the Archbishop's and the owner of the opposition newspaper, *El Independiente*. Notice of the mass, celebrated at six o'clock in the afternoon, had been published in the newspapers, *La Prensa Grafica* and *Diario de Hoy*. Hr'g Tr. 8/24/04 (Garay), 107:5–7; 108:21–25; 109:1; Hr'g Tr. 8/24/04 (Ramirez Amaya) 34:19–22; 35:10–11; Hr'g Tr. 8/26/04 (Hernandez), 153:2–7; Ex. 40 (photo of Jorge Pinto); IACHR Decision, ¶ 45, n. 31; Ex. 115 (announcement of mass for Sara Meardi di Pinto).

41. The bearded man in the car directed Garay to act like he was fixing something in the car. Garay bent over in the front seat. Hr'g Tr. 8/24/04 (Garay), 107:8–11.

42. Garay then heard a loud explosion as the bearded man in the back seat of the vehicle shot Archbishop Romero. Hr'g Tr. 8/24/04 (Garay), 107:12–13, 108:24; Complaint, ¶ 6; TC Report, pp. 28, 127, 130, 131.

43. The man told Garay to drive slowly away from the church. Garay drove slowly, and subsequently got lost, but the shooter made contact with the security car by radio and was given directions back to the house with the Japanese Maronon trees. Hr'g Tr. 8/24/04 (Garay), 107:14–22.

44. When Garay and the shooter returned to the house with the Maronon trees, they were greeted by Saravia. The shooter informed Saravia that the assignment had been carried out. Saravia told Garay and the shooter that he had heard the news on the radio that the Archbishop had died instantly. Complaint ¶ 16; Hr'g Tr. 8/24/04 (Garay), 109:20–22, 24–25; 110:1–4.

45. Saravia, Nelson Morales, Nelson Garcia and Garay drove back to Saravia's house in a Jeep Cherokee, which was the

vehicle regularly used to transport Saravia. Hr'g Tr. 8/24/04 (Garay), 101:24; 115:7.

46. Once at Saravia's house, Saravia advised Garay that Garay, Nelson Morales, and Nelson Garcia would sleep at a different house that night. Hr'g Tr. 8/24/04 (Garay), 116:25; 117:1, 3–10; 119:1, 4–5.

47. Several days later, Garay drove Saravia from Saravia's home to a house in Sal Salvador that looked like a castle. The house had a long driveway and a big, white gate. Major D'Aubuisson emerged from the house. Saravia saluted Major D'Aubuisson and told him, "Mission completed." Complaint, ¶ 17; Hr'g Tr. 8/24/04 (Garay), 127:1–11, 16–23; 127:5–9.

48. Saravia also delivered to the assassin a sum of money, which earlier had been provided to him to pay the assassin, or his agent. Complaint, ¶ 17; RT Report, pp. 127, 131.

49. On a later date, Garay was driving Saravia past an empty lot. He saw a car that had been burned. Saravia told Garay that the car was the red Volkswagen that had been used to transport the shooter to the Romero assassination. Hr'g Tr. 8/24/04 (Garay) 115:9–11, 13–18, 20–25; 116:1–8.

B. *Events in the Immediate Aftermath of the Assassination.*

50. Archbishop Romero fell where he had been shot at the Chapel of the Hospital of Divine Providence and was tended to by the nuns who lived and worked there. He was rushed to the Policlinica Hospital in a station wagon right after he was shot. Hr'g Tr. 8/26/04 (Hernandez), 149:18–20; Exs. 22, 24–30, 34, 36, 38 (photos of assassination); Declaration of Maria Clelia Flores Iraheta, ¶ 7, filed 8/20/04.

51. At the Hospital of Divine Providence, many people were gathered, including Father Jon Cortina; Monsenor Ricardo Urioste; other nuns and priests; one of the lawyers for the Archdiocese's human rights office, Florentin Melendez; the members of an American ecumenical delegation; relatives of the Archbishop; and others. Hr'g Tr. 8/24/04 (Wipfler), 73:20–24; Hr'g Tr. 8/25/04 (Ramirez Amaya) 30:22–25; Hr'g Tr. 8/26/04 (Cortina), 104:1–2; 5–6; Hr' Tr. 8/26/04 (Hernandez), 145:21–23; 146:4–6, 9; Ex. 42 (photograph at the Policlinica); Declaration of Rosa Nohemy Ortiz, ¶ 7, filed 8/20/04; Declaration of Philip Berryman, ¶ 21, filed 8/20/04; Declaration of Thomas Quigley, ¶ 4, filed 8/20/04.

52. Archbishop Romero was pronounced dead on his arrival at the Policlinica. Hr'g Tr. 8/24/04 (Wipfler), 73:23–24.

53. At the Chapel of the Hospital of Divine Providence, some of the hospital patients were detaining the photographer from the newspaper, *Diario de Hoy,* who had attended the mass. He initially was suspected of carrying out the assassination. Father Cortina testified he was somewhat knowledgeable about photography, he went to Divine Providence to investigate this situation. Hr'g Tr. 8/26/04 (Cortina), 104:8–21, 105:5–13; Hr'g Tr. 8/26/04 (Hernandez), 150:21–23.

54. Fearful to go by himself, Father Cortina was accompanied by Monsenor Modesto Lopez to the Chapel of the Hospital of the Divine Providence. Father Cortina arrived at the chapel and hospital area around 8:00 p.m. At that time, the area was filled with armed soldiers wearing camouflage uniforms and armed policemen, he believed were members of the National Police. Hr'g Tr. 8/26/04 (Cortina), 104:25, 105:3–4; 108:10–15; 108:25–109:10. Father Cortina determined that the two cameras of the photographer could not have been converted to fire a bullet and were not out of the ordinary. Father Cortina then left with the photographer to assist him in developing the photographs

at the offices of the *Diario de Hoy*. Hr'g Tr. 8/26/04 (Cortina), 104:20–24; 105:1–2, 5–15, 16–18; 107:11–16; Exs. 24, 25, 27–30, 33–36 (photographs of assassination).

### C. *Post–Assassination Investigation.*

55. Judge Atilio Ramirez Amaya, the Criminal Judge of the Fourth Criminal Court in San Salvador, testified he attempted to carry out a serious investigation into the assassination of Archbishop Romero, but National Police and other government officials charged with assisting in the investigation actively obstructed his efforts, failed to conduct a timely investigation, failed to collect and preserve material evidence, and failed to identify witnesses. Complaint, ¶ 18; Hr'g Tr. 8/25/04 (Ramirez Amaya), 22:2–4; 23:5–7, 15–18; 24:6–15; 27:4–7, 11–18; 45:21–25; 46:1–11; TC Report, p. 128; IACHR Decision, ¶¶ 10, 12, 20, 43, 46, 87–91.

56. On March 24, 1980, Judge Ramirez Amaya heard by word of mouth that Archbishop Romero had been shot. He went to the Policlinica Hospital after he determined that Archbishop Romero had not been taken to the forensic clinic, a departure from the normal procedure. He arrived around seven o'clock in the evening. The National Police had not informed Judge Ramirez Amaya of the murder, also a departure from standard procedure. Since Romero was a person of high ranking, Judge Ramirez Amaya, as the Criminal Judge in San Salvador, immediately took over the investigation from the Justice of the Peace. Hr'g Tr. 8/25/04 (Ramirez Amaya), 22:19–22; 23:15–18, 20–23; 28:17–21, 22–25; 28:12–14; 29:1–10.

57. Judge Ramirez Amaya did not observe any police at the Policlinica despite the fact that they should have been there to ensure security. Judge Ramirez Amaya then called his secretary and asked him to call the police to request their presence at the Policlinica. The police never arrived.

Hr'g Tr. 8/25/04 (Ramirez Amaya), 27:4–7; 30:13–18; 31:21; 46:9–11.

58. The room finally was cleared of all the people, and Judge Ramirez Amaya ordered the forensic doctors to perform the autopsy. The autopsy was performed by Dr. Cuellar Ortiz, Dr. Pedro Chavarria, and two others. Judge Ramirez Amaya and his secretary were present during the autopsy. Hr'g Tr. 8/25/04 (Ramirez Amaya), 31:1–5; 32:22–25; TC Report, p. 128.

59. The first step in the autopsy was the taking of X-rays to make a determination as to the location of the bullet in Archbishop Romero's body. The first X-ray was unsuccessful so two or three more X-rays were taken. From these X-rays, the doctors determined that a small entry wound, barely 5 millimeters in diameter in the right thorax, evidenced the point of entry of the bullet. The bullet had fragmented into three parts and was still inside Archbishop Romero's thorax. Hr'g Tr. 8/25/04 (Ramirez Amaya) 31:5–8; TC Report, p. 128; Ex. 113 (Romero autopsy report).

60. The forensic doctors cut the cartilage in the sternum area of Archbishop Romero's chest to open his thorax. They discovered a number of blood clots which inhibited the locating of the bullet fragments. The blood clots were removed and dissolved individually. Finally, the bullet fragments were located. Hr'g Tr. 8/25/04 (Ramirez Amaya) 31:9–18; TC Report, p. 128; Ex. 113 (Romero autopsy report).

61. The autopsy took almost four hours. The book of acknowledgment and the final autopsy report, signed by Dr. Chavarria, on behalf of his colleagues, and by Judge Ramirez Amaya and his secretary, recorded that Archbishop Romero died from a hemorrhage caused by the bullet fragments severing his aorta and the *venae cavae*. Hr'g Tr. 8/25/04 (Ramirez Amaya) 32:5–6, 9–21; 33:1–3, 6–7;

IACHR Decision, ¶¶ 45, 46; Ex. 113 (Romero autopsy report).

62. At this point, Judge Ramirez Amaya requested that his secretary telephone the National Police once again so the police could secure the evidence in bags, as was standard operating procedure. The police did not arrive. Hr'g Tr. 8/25/04 (Ramirez Amaya), 24:12–15; 31:19–22.

63. Later, Judge Ramirez Amaya requested that his secretary place yet another call to the National Police to arrange for them to accompany him and his secretary to the scene of the crime, the Chapel of the Hospital of the Divine Providence. The police never arrived. Judge Ramirez Amaya was forced to take the evidence, the bullet fragments and the X-rays, with him. Judge Ramirez Amaya and his secretary had to travel to the crime scene in Judge Ramirez Amaya's private vehicle. Hr'g Tr. 8/24/04 (Ramirez Amaya), 33:8–15; 34:14–17.

64. When Judge Ramirez Amaya arrived at the chapel around 11:30 p.m., Florentin Melendez and Roberto Cuellar, the two lawyers for the Archdiocese's Human Rights Office, were present. No police were present. Hr'g Tr. 8/25/04 (Ramirez Amaya), 33:6–18; 34:15; Hr'g Tr. 8/26/04 (Hernandez), 146:9–18, 21–23; 147:9–10.

65. Judge Ramirez Amaya and the others canvassed the small chapel in search of the bullet. They took measurements to determine the range and distance from which the shot could have been fired. They thoroughly searched for any type of evidence but found none. Hr'g Tr. 8/25/04 (Ramirez Amaya), 33:19–25.

66. A short time before midnight, Judge Ramirez Amaya drove his secretary to the court, where his secretary stayed instead of returning to the secretary's home as it would have been extremely dangerous to drive there. By this time, Judge Ramirez Amaya observed Army tanks on the streets and police patrolling

with automatic weapons. Hr'g Tr. 8/25/04 (Ramirez Amaya), 34:2–13.

67. Because the National Police never came to pick up the evidence, Judge Ramirez Amaya took the bullet fragments and the X-rays with him to his home. Hr'g Tr. 8/25/04 (Ramirez Amaya), 34:14–17.

68. The next day, March 25, 1908, Judge Ramirez Amaya went to his chambers at the Fourth Criminal Court. There, he organized the files on the case and the book of acknowledgment so that it could be transcribed. He also was made aware of the published advertisement announcing Archbishop Romero's celebration of the memorial mass for Sara Meardi de Pinto the previous evening. Hr'g Tr. 8/25/04 (Ramirez Amaya), 26:20–24; 34:19–22, 23–25; 35:18–21.

69. The National Police finally went to the crime scene four days after the assassination. The police did not collect evidence nor did they provide the investigating judge any information or evidence to assist in the investigation. IACHR Decision, ¶¶ 46, 88, 89; Complaint, ¶ 18.

70. Despite a National Police analysis confirming Judge Ramirez Amaya's conclusion that the projectiles extracted from Archbishop Romero's body came from a .22 caliber bullet, these conclusions never appeared in the judicial file of Archbishop Romero's case. The X-rays also disappeared from the judicial file. TC Report, p. 128; IACHR Decision ¶¶ 46, 90; Complaint, ¶ 18.

71. Pedro Napoleon Martinez was alleged to have been an eyewitness to the flight of the assassins. At the chapel, he assisted in moving Archbishop Romero's body for transport to the hospital. Twenty days after the assassination, on April 13, 1980, P. Martinez was kidnapped and disappeared. His disappearance was nev-

er investigated. Complaint, ¶ 18; Hr'g Tr. 8/26/04 (Hernandez), 149:18–22, 25, 150:1–4; 152:22–23; Hr'g Tr. 8/27/04 (Karl) 129:4–130:16; Ex. 34 (photograph showing Martinez helping to remove Romero from the chapel); IACHR Decision, ¶¶ 11, 103–104.

72. In the months following the assassination, several other suspicious events occurred, obstructing any investigation of the murder of Archbishop Romero. These included:

- On July 5, 1980, the offices of Socorro Juridico were searched by the National Police and the files concerning Socorro Juridico's investigation of the assassination were removed and were never seen again. IACHR Decision, ¶ 106; Hr'g Tr. 8/26/04 (Hernandez), 148:1–15, 20–23; 149:7–10.

- In 1980, both the Director of Socorro Juridico, Roberto Cuellar, and its staff attorney working on the investigation of the assassination of Archbishop Romero, Florentin Melendez, were forced to flee El Salvador after receiving death threats. Hr'g Tr. 8/26/04 (Hernandez), 146:9–16; 21–25; 147:1–25; Ex. 42 (photo of Melendez at autopsy).

D. *Attack on Judge Amaya.*

73. On March 25, 1980, Judge Ramirez Amaya received a telephone death threat at his home. Altogether, on March 25 and 26, Judge Ramirez Amaya received three or four telephoned death threats. In one instance, his thirteen-year old daughter, who answered the phone, was asked her favorite color. She was told that "that was the color they would paint the coffin that they would have [Judge Ramirez Amaya] in." Hr'g Tr. 8/25/04 (Ramirez Amaya), 39:2–10; 41:16; IACHR Decision ¶ 114.

74. On March 27, 1980, at about 10:15 p.m., two men knocked at Judge Ramirez Amaya's door. The men claimed to know a friend of the Judge. Ramirez Amaya told his housekeeper to carefully open the door. The two men entered his home. Hr'g Tr. 8/25/04 (Ramirez Amaya), 39:11–22; 40:4–5.

75. Judge Ramirez Amaya, armed with a twelve gauge shotgun, stayed in the bedroom. He opened the bedroom door, peeked out, and realized that he did not know the men. He told them to be seated. Hr'g Tr. 8/25/04 (Ramirez Amaya), 39:22–23; 40:5–9.

76. One of the man immediately pulled an automatic weapon from a briefcase he was carrying. Judge Ramirez Amaya responded by pulling out his shotgun. As Judge Ramirez Amaya was about to fire at them, his housekeeper ran towards him. Hr'g Tr. 8/25/04 (Ramirez Amaya), 40:10–15; IACHR Decision ¶ 112.

77. One of the men fired the gun at Judge Ramirez Amaya. However, since the housekeeper was in the way, the gunman missed the judge and, instead, wounded the housekeeper. She was injured in the back and the buttocks area. She fell towards Judge Ramirez Amaya, who was not able to break her fall. Hr'g Tr. 8/25/04 (Ramirez Amaya), 40:17–22; IACHR Decision, ¶¶ 11, 112.

78. The men immediately fled from Judge Ramirez Amaya's home. Outside, they shot at the house and the tires of Judge Ramirez Amaya's car. Hr'g Tr. 8/25/04 (Ramirez Amaya), 40:23–25; 41:1–2.

79. Judge Ramirez Amaya then heard noises on the roof of his house. He began to fire his shotgun out the windows. He was mindful of the fact that within recent weeks, Mario Zamora, the Attorney General of El Salvador, the mayor of the City of San Miguel had been killed in a similar fashion. Hr'g Tr. 8/25/04 (Ramirez Amaya), 41:4–11.

80. Judge Ramirez Amaya yelled to his wife "Josefina, they are going to kill us, just like they did with Mario Zamora," and urged her to fire a pistol out the windows. In addition, Judge Ramirez Amaya protected his daughter by throwing a mattress over her. He crawled through his home and listened for the attackers. Finally, the noises stopped. Hr'g Tr. 8/25/04 (Ramirez Amaya), 41:12–20.

81. Breaking the silence ten minutes later, the phone rang. The voice on the other end said, "Doctor, this is Elicio Soto from the National Police." This voice was familiar to Judge Ramirez Amaya as he had known Soto, now a National Police inspector, since childhood. Ramirez Amaya's mother had assisted Soto in obtaining his job with the police. Hr'g Tr. 8/25/04 (Ramirez Amaya), 41:21–25; 42:1–9.

82. Next, in a surprised tone of voice, Soto said to Ramirez Amaya, "Doctor, you are alive." Judge Ramirez Amaya answered, "Yes, I am happy to be alive." Soto replied, "Don't worry. Perhaps they were just trying to scare you." Hr'g Tr. 8/25/04 (Ramirez Amaya), 42:10–15.

83. Within a half hour, family and friends, whom Judge Ramirez Amaya had telephoned, arrived at his house. When he opened the door for them, Judge Ramirez Amaya also greeted some of his neighbors and the night watchman. The night watchman informed Judge Ramirez Amaya that the police must have been "deaf" because two marked police vehicles had been parked on the street during the assassination attempt and did not move. Hr'g Tr. 8/25/04 (Ramirez Amaya), 42:16–20, 24–25; 43:1–5, 6–9.

84. One of Judge Ramirez Amaya's students at the National University, the boyfriend of his neighbors, was visiting his girlfriend at the same time as the attack. He confidentially informed Judge Ramirez Amaya that he saw that three persons were involved in the attempted murder of the Judge. In addition to the two men who entered the house, one remained behind in the get-away car. He told Ramirez Amaya that he personally knew the man at the wheel of the car to be a member of the National Police. Judge Ramirez Amaya knew that the neighbor's boyfriend had worked with the National Police. Hr'g Tr. 8/25/04 (Ramirez Amaya), 43:10–25.

85. The night of the attempt, a group of police detectives arrived at Judge Ramirez Amaya's home and inquired what was happening. They dismissed the assassination attempt as the work of "amateurs" that they could have prevented from happening. No further investigation occurred thereafter. Hr'g Tr. 8/25/04 (Ramirez Amaya), 44:3–6; 46:12–22; IACHR Decision, ¶¶ 115, 116.

86. At this point, Judge Ramirez Amaya told his wife they would be killed by the police so they had to leave El Salvador. Despite the fact that he had a ticket to go to Venezuela two days later, Judge Ramirez Amaya determined that, with police control of the airports, traveling by plane would be too risky. He arranged to leave by boat through the Gulf of Fonseca and to travel directly to Nicaragua. Complaint, ¶ 18; Hr'g Tr. 8/25/04 (Ramirez Amaya), 43:25; 44:1–2, 20–25; 45:1–4, 6–9.

87. Judge Ramirez Amaya went to the hospital the next day to visit his housekeeper. He found that she had not been admitted to the hospital. She was still lying on the floor in the hallway. A doctor explained that they did not intend to remove the bullets and would send her home the next day. Hr'g Tr. 8/25/04 (Ramirez Amaya), 44:7–19.

88. Judge Ramirez Amaya then resigned his position and fled El Salvador. Judge Ramirez Amaya was not able to return to El Salvador for almost ten years. Complaint, ¶ 18; Hr'g Tr. 8/25/04 (Ramirez

Amaya), 21:7–11, 19–20; 45:10–13; IACHR Decision, ¶ 46.

89. The assassination attempt against Judge Ramirez Amaya was never investigated. Hr'g Tr. 8/25/04 (Ramirez Amaya), 44:3–6.

90. The Truth Commission concluded that "[t]here is sufficient evidence that the failed assassination attempt against Judge Atilio Ramirez Amaya was a deliberate attempt to deter investigation of the case." TC Report, pp. 127, 128, 131; IACHR Decision ¶ 54 (*citing with approval* the finding of the TC Report).

E. *The Funeral for Archbishop Romero.*

91. For one week after the assassination, Archbishop Romero's body was available for viewing by the public. His coffin was never alone. Different communities were a part of this ritual by leading the activities and mass each day. Hr'g Tr. 8/27/04 (Guerra), 59:13–17; Hr'g Tr. 8/26/04 (Cortina), 111:10–18; Declaration of Julia Elvira Chacon, ¶ 8, filed 8/20/04.

92. On March 31, 1980, the funeral for Romero was held at the cathedral in San Salvador. The National Palace, located next to the cathedral, was an official government building, inaccessible to the public, and could be entered only by government officials. The day of the funeral, the palace was closed. Nonetheless, during the funeral mass, bombs were thrown into the crowd from a window at the far end of the National Palace. Additionally, government officials in civilian clothes were stationed on the roofs of the National Palace and surrounding buildings. After the bombs were thrown, government officers in plainclothes on the roofs opened fire on the crowd. Hr'g Tr. 8/26/04 (Cortina), 115:10–16, 25; 116:1–4, 24–25; Hr'g Tr. 8/26/04 (Acosta), 40:1–2, 18–20; 39:12–20; Hr'g Tr. 8/27/04 (Guerra), 60:19–21.

93. The bombs and gunfire caused the approximately 100,000 people at the funeral to run in fear. Many in the crowd were trampled. The priests who had carried Archbishop Romero's casket were forced to take his body inside the cathedral and hurriedly place it in the burial vault for fear that it would be stolen. About 5,000 people crammed into the cathedral in search of safety. Once Archbishop Romero was buried, the priests encouraged those in the cathedral to sing. Hr'g Tr. 8/27/04 (Guerra), 61:7–20; Hr'g Tr. 8/27/04 (Acosta), 40:1–8; Hr'g Tr. 8/26/04 (Cortina), 115:4–8. *See also* Declaration of the Rev. Charles Harper, ¶ 16, filed 9/01/04; Declaration of Carlos Ayala Ramirez, ¶ 9, filed 8/20/04; Declaration of Philip Berryman, ¶ 22, filed 8/20/04; Declaration of Julia Elvira Chacon, ¶ 9, filed 8/20/04; Declaration of Maria de la Luz Cueva Santana, ¶ 7, filed 8/20/04; Declaration of Pierre Jean DeClarcq, ¶ 8, filed 8/20/04; Declaration of Jose Humberto Giron Pez, ¶ 9, filed 8/20/04.

94. After about two hours, some of the priests went outside to the plaza. They recovered seventeen dead bodies. Not until 4:30 in the afternoon were all the priests and nuns who had been trapped in the cathedral able to leave under Red Cross protection. Hr'g Tr. 8/27/04 (Guerra), 61:21–24; 62:6–8, 17–19; Ex. 65 (photo of dead bodies at funeral); Ex. 66 (photo of nuns leaving cathedral at funeral).

V. *FAILED EFFORTS TO PROSECUTE ARCHBISHOP ROMERO'S KILLERS*

A. *The Arrest of D'Aubuisson, Saravia, Garay and Others at the San Luis Finca on May 7, 1980.*

95. On May 7, 1980, twelve civilians and twelve military personnel met at a farmhouse near San Salvador known as the San Luis Finca. They included D'Au-

buisson, Saravia and Garay, as well as numerous other persons associated with El Salvador's rightwing death squads. At the meeting, D'Aubuisson gave his .45 millimeter handgun to Garay to hold while he was inside the farmhouse. Hr'g Tr. 8/24/04 (Garay), 121:12–122:13; Hr'g Tr. 8/24/04 (White) [White Dep. 43:18–44:14]; Hr'g Tr. 8/27/04 (Karl), 152:17–153:5; Ex. 122 (May 8, 1980 U.S. diplomatic cable); Ex. 125 (May 12, 1980 report of Maj. Jose Francisco Samayoa); TC Report, pp. 28 and 129.

96. While the meeting was going on, troops from the Salvadoran Army's First Brigade raided the farmhouse, arresting, among others, D'Aubuisson, Saravia and Garay. The raid had been ordered by Col. Majano, a member of the five-man Revolutionary Governing Junta. Hr'g Tr. 8/24/04 (White), [White Dep. 45:13–47:5]; Ex. 122 (May 8, 1980 U.S. diplomatic cable).

97. Numerous documents were seized during the raid which implicated many of those arrested in the assassination of Archbishop Romero, a coup plot, and other serious crimes. Hr'g Tr. 8/24/04 (White) [White Dep. 40:10–20 and 63:14–64:2]; Ex. 122, Ex. 125; Ex. 127 (June 19, 1980 U.S. diplomatic cable); Declaration of Todd R. Greentree, ¶¶ 5 & 7, filed 8/20/04; Hr'g Tr. 9/3/04 (Karl), 3:6–12, 4:10–12, 5:9–16.

98. Members of the Junta and experts contacted by U.S. Ambassador White concluded that the "Operacion Piña" documents seized at the San Luis Finca, along with the so-called "Saravia Diary," referred to the plan to assassinate Archbishop Romero. Hrg. Tr. 8/24/04 (White), [White Dep. 35:2–39:2]; Hrg. Tr. 9/3/04 (Karl), 19:15–22:10; Ex. 122 (May 8, 1980 U.S. diplomatic cable); TC Report, p. 129.

99. On May 12, 1980, Col. Majano lost his influence over the Junta when Col. Jaime Abdul Gutiérrez was appointed President of the Junta by the High Command of the Armed Forces. That same day, several newspapers published a message from a group calling itself "death squad" that demanded the release of D'Aubuisson and the others arrested at the San Luis Finca. TC Report, p. 204, n. 24.

100. D'Aubuisson and the others arrested at the San Luis Finca were soon released without ever being interrogated, much less prosecuted for any of the crimes for which they were implicated. Col. Majano was removed from the Junta by the end of the year, and was forced to flee El Salvador not long afterwards. Hrg. Tr. 8/24/04 (Garay); 123:15–124:4; Hrg. Tr. 8/24/04 (White), [White Dep. 47:9–14]; Hrg. Tr. 9/3/04 (Karl), 9:15–17, 32:1–6; TC Report, pp. 28, 29 and 205, n. 29.

B. *Failed Investigations During the Early and Mid–1980s.*

101. The investigation of Archbishop Romero's murder was not pursued by the Government of El Salvador in the months following the killing and was actively thwarted in many ways. In June 1984, José Guerrero, a member of the ARENA party, Roberto D'Aubuisson's personal lawyer, and a former delegate to the CAL, the regional anti-communist league, was named as Public Prosecutor of El Salvador by the Legislative Assembly, which at the time was controlled by ARENA and its allies. IACHR Decision at ¶ 120; Hrg. Tr. 9/3/04 (Karl), 51:11–17.

102. On December 12, 1984, the Fourth Criminal Court's investigation of the Romero assassination was formally closed. IACHR Decision at ¶ 14.

103. The Fourth Criminal Court's investigation was reopened in 1985. *Id.*

104. On May 21, 1985, the Legislative Assembly, which was no longer controlled by ARENA, dismissed Guerrero as the Public Prosecutor "for not meeting the well-known requirements of morality and

competence." However, Guerrero was quickly reinstated by the Salvadoran Supreme Court of Justice, which ruled that his dismissal had been unconstitutional. *Id.* at ¶ 120.

105. In August 1985, the Public Prosecutor, Guerrero, submitted the statement of Robert Adalberto Salazar Collier ("Pedro Lobo") to the Fourth Criminal Court. At that time Guerrero did not mention that the videotaped "confession" of "Pedro Lobo" had first been presented by Major D'Aubuisson during the March 1984 electoral campaign, and that it had been immediately discredited when it was determined that "Pedro Lobo" was a common criminal who had been incarcerated from 1979 through 1981 and who had admitted that he had been offered $50,000 to confess to being an accomplice in the assassination of Archbishop Romero. IACHR Decision at ¶ 50, n. 43; TC Report, p. 129.

C. *The Failed Extradition Effort of 1987–1988.*

106. In January 1986, President José Napoleón Duarte appointed a Commission to Investigate Criminal Acts ("the Investigative Commission") to give impetus to the Romero investigation. IACHR Decision at ¶ 14.

107. The work of the Investigative Commission led to the discovery of Amado Antonio Garay, Saravia's former driver. On November 20, 1987, the Investigative Commission presented Garay to Judge Ricardo Alberto Zamora Pérez of the Fourth Criminal Court, who took Garay's sworn statement. IACHR Decision at ¶ 52; Complaint, ¶ 20, TC Report at p. 130.

108. On November 24, 1987, Judge Zamora charged Saravia with aggravated homicide in violation of Article 53 of the Salvadoran Penal Code for his alleged role in the murder of Archbishop Romero. Judge Zamora issued an arrest warrant for Saravia, and an extradition request was duly issued to the United States. TC Report, p. 130.

109. On November 25, 1987, the United States Department of Justice filed a Criminal Complaint against Saravia in the United States District Court for the Southern District of Florida, and that court issued a warrant for his arrest. *U.S. v. Alvaro Rafael Saravia Merino,* Case No. 87–3598–CIV, (S.D.Fla.11/15/87). The November 25, 1987 affidavit of Sharon L. Kegerreis, an Assistant U.S. Attorney for the Southern District of Florida, filed in support of the Complaint identifies Saravia as a citizen of El Salvador who was born on February 16, 1946 in Santiago de Maria, Usulatan Province, El Salvador. *U.S. v. Alvaro Rafael Saravia Merino,* Affidavit of Sharon L. Kegerreis at ¶ 5.

110. On November 27, 1987, Saravia was arrested in Florida pursuant to the arrest warrant. *U.S. v. Alvaro Rafael Saravia Merino,* Case No. 87–3598–CIV, "Certification of Extraditability and Order of Commitment" (S.D.Fla. Sept. 27, 1988), p. 1; Complaint, ¶ 20.

111. Saravia, reportedly with funding for his legal costs provided by Major D'Aubuisson, filed *habeas corpus* petitions in both the U.S. and Salvadoran courts. *See Saravia v. U.S.,* 88–01975–CIV–TES (S.D.Fla.). On October 3, 1988, the United States Ambassador to El Salvador, William Walker, sent a diplomatic cable to the United States Secretary of State regarding "The Saravia Extradition and the D'Aubuisson Mafia." Ex. 96, p. 1. Ambassador Walker reported the following to the Secretary of State:

> There is ample circumstancial [sic] evidence that an effort is underway to obstruct the extradition from the U.S. of Cpt. Alvaro Rafael Saravia, the cashiered Salvadoran Air Force officer charged with complicity in the March 24, 1980 assassination of Archbishop Oscar

Arnulfo Romero. The effort is traceable to Roberto D'Aubuisson and associates through a document telefaxed from D'Aubuisson's Mariscos Tazumal office to Saravia's U.S. lawyer for entry into the Saravia extradition court records.

\* \* \* \* \* \*

The Mariscos Tazumal fax identification clearly links the Saravia defense to an entire realm of coup plotters, death squad chiefs, kidnappers, baby robbers, mad bombers, car thieves, and other assorted criminals. None, however, has ever been convicted, and prosecution is unlikely as long as D'Aubuisson and his backers are free to manipulate the Salvadoran judicial system.

Ex. 96, pp. 1 and 8.

112. On December 19, 1988, the Constitutional Division of the Supreme Court of Justice of El Salvador issued a decision ordering the Fourth Criminal Court to stop the investigation of Saravia and to withdraw the warrant for his arrest. *U.S. v. Alvaro Rafael Saravia Merino,* Case No. 87–3598–CIV, "Government's Motion to Dismiss Extradition Proceedings" (S.D.Fla. Dec. 28, 1988) (attaching a certified translation of the Salvadoran court's decision).

113. No member of the Salvadoran Supreme Court had been present when Garay gave his statement. The Chief Judge of the Supreme Court at the time was the same José Francisco Guerrero who had served as D'Aubuisson's personal lawyer and who had submitted the discredited "Pedro Lobo confession" to the Fourth Criminal Court when he was the Public Prosecutor in 1985. *Id.,* Hrg. Tr. 9/3/04 (Karl), 51:11–53:1, 55:23–56:10.

114. The U.N. Truth Commission found the Salvadoran Supreme Court "played an active role that served to hinder the extradition from the United States and later imprisonment of Saravia in El Salvador." The Truth Commission inter-preted the decision as politically motivated. Complaint, ¶ 20; TC Report, p. 131; IACHR Decision, ¶ 98.

115. On December 28, 1988, the U.S. District Court for the Southern District of Florida vacated the Certificate of Extraditability and Order of Commitment and ordered the United States Marshals to release Saravia. *U.S. v. Alvaro Rafael Saravia Merino,* Case No. 87–3598–CIV, "Order of Dismissal and Vacation." (S.D.Fla. Dec. 28, 1988).

116. No further efforts have ever been made in El Salvador to prosecute Saravia or anyone else for the murder of Archbishop Romero. Complaint, ¶ 21.

D. *End of Civil War.*

117. From 1980 to 1992, El Salvador was engaged in full-scale civil war, caused in part by the assassination of Archbishop Romero. In 1990, the parties began informal talks about the possibility of negotiating a peace agreement. Actual negotiations continued from 1990 to 1992. A formal cease fire and Peace Accords were signed in Chapultepec, Mexico, on January 16, 1992. The peace agreement required the dismantling of the Treasury Police and the National Police because they "were so thoroughly repressive and corrupt that they could not be saved." However, the death squads that operated out of those forces were not entirely dismantled. Hrg. Tr. 8/25/04 (White), [White Dep. 55:13–56:1]; Hrg. Tr. 8/27/04 (Acosta), 41:2–6; 42:6–21; Hrg. Tr. 8/25/04 (Karl), 75:6–18, 93:3–16.

E. *United Nations Truth Commission.*

118. In accordance with the Peace Accords, the United Nations established a Truth Commission that began investigating crimes committed since 1980. It was set up in July 1992 and was composed of former Colombian president Belisario Be-

tancur, former Venezuelan foreign minister Reinaldo Figueredo Planchart, and George Washington University law professor Thomas Buergenthal. The Truth Commission's report on "serious acts of violence" since 1980 entitled "From Madness to Hope: the 12–Year War in El Salvador: Report of the Commission on the Truth for El Salvador," was released on March 15, 1993, at the United Nations. The peace agreements also commissioned the Truth Commission to make "legal, political or administrative" recommendations that were either general or related to specific cases. The Truth Commission was delegated two specific powers: the power to make investigations and the power to make recommendations. The Parties to the peace agreement had agreed to be bound by the Truth Commission's recommendations. TC Report, p. 11, 18–25; Hrg. Tr. 8/25/04 (Karl), 75:19–21.

119. The Truth Commission testimony attributed almost 85% of all abuses to agents of the government of El Salvador, allied paramilitary groups, and the death squads. TC Report, p. 43. Among other things, the Truth Commission concluded that:

- Violence in the 1980s "originated in a political mind-set that viewed political opponents as subversives and enemies." TC Report, p. 43.
- Those who promoted opposing ideas that questioned official policy were automatically labeled subversive and deemed to be working for the guerrillas. TC Report, p. 43.
- In the early 1980s, violence in rural areas was "indiscriminate in the extreme." TC Report, p. 44.
- Several members of the armed forces admitted and gave details of their involvement at the highest levels in the organization, operation and financing of the death squads. TC Report, p. 132.

- Between 1980 and 1991, human rights violations were committed in a systematic and organized manner by groups acting as death squads. TC Report, p. 132.
- Many of the civilian and military authorities in power during the 1980s "participated in, encouraged and tolerated" the activities of the death squads. TC Report, p. 132, 137.
- The intelligence sections of many armed forces units operated on the death squad model, dressing in civilian clothes and driving unmarked cars. TC Report, p. 136.
- Salvadoran exiles living in Miami "directly financed" certain death squads. TC Report, p. 137.
- The lack of effective action by the judicial system was a factor in maintaining impunity for "members and promoters" of the death squads. TC Report, p. 137.
- None of the branches of government were capable of restraining the military's overwhelming control of society. TC Report, p. 172.
- The judicial system suffered from a "glaring inability" to investigate crimes or to enforce the law, especially with regard to crimes committed or supported by government institutions. TC Report, p. 178.

120. Based on these findings, the Truth Commission recommended, among other things:

- The discharge of officers in the Salvadoran armed forces who were named in the report. TC Report, p. 176.
- The appointment of a new Supreme Court. TC Report, p. 177.
- Elimination of the defense of "due obedience" for soldiers who carry out orders that are clearly illegal. TC Report, p. 179.

- The subordination of the military to civilian authorities. TC Report, p. 179.
- The eradication of illegal armed groups by "all necessary measures." TC Report, p. 180.
- Review of the constitutional rules which led to "tremendous concentration" of power in the hands of the Supreme Court, particularly its President. TC Report, p. 181.

121. The Truth Commission was unable to recommend specific penalties because, as it found: "El Salvador has no system for the administration of justice which meets the minimum requirements of objectivity and impartiality so that justice can be rendered reliably. This is a part of the country's current reality and overcoming it urgently should be a primary objective for Salvadoran society." TC Report, p. 178.

F. *Amnesty Law.*

122. On March 20, 1993, five days after the Truth Commission Report was released at the United Nations, the Legislative Assembly of El Salvador adopted the General Amnesty Law by Decree No. 486 ("Amnesty Law"). IACHR Decision, ¶ 55; Hrg. Tr. 8/26/04 (Hernandez), 126:3–10, 128:4–12; Hrg. Tr. 9/3/04 (Roht–Arriaza), 130:16–21, 131:14–17.

123. The Amnesty Law grants a "broad, absolute and unconditional amnesty . . . in favor of all those who in one way or another participated in political crimes, crimes with political ramifications, or common crimes committed by no less than twenty people, before January 1, 1992." The Amnesty Law extends to indirect perpetrators and accomplices as well, and includes those who have been convicted, indicted or not yet charged. *Id.* At Art. 1, 4.

124. Shortly after passage of the Amnesty Law, on March 31, 1993, Judge Luis Antonio Villeda Figueroa applied the Amnesty Law to Saravia and dismissed with prejudice the case against him for the murder of Archbishop Romero. Specifically, Judge Villeda found that the Romero assassination was a "political" crime which provides Saravia with amnesty under the 1993 law. Judge Villeda's decision was upheld by the First Criminal Chamber on May 13, 1993, which entered a final judgment in the case because the time for the Office of the Public Prosecutor to file a motion had expired without any action. The First Criminal Chamber ruled that its decision has *res judicata* effect with regard to Saravia in the Romero case. IACHR Decision, ¶¶ 22, 98, n. 100, 101; Amnesty Law, Art. 2, 4(c).

125. The Inter–American Commission on Human Rights found in 2000 that "the application of the General Amnesty Law in the [Romero] case eliminated the possibility of undertaking judicial investigations aimed at determining the responsibility of all those involved. In addition, that decision violated the right of the victim's relatives and of society at large to know the truth about the events in question." The IACHR Commission recommended that the government of El Salvador pass legislation to nullify the amnesty law. IACHR Decision, ¶¶ 151, 159(3).

126. No such legislation has ever been passed. The Salvadoran Supreme Court has twice upheld the constitutionality of the Amnesty Law, in 1993 and 2000. Although the Court's 2000 decision, postdating the IACHR Decision does not foreclose narrowing of the amnesty, in the twelve years following enactment, no prosecutions have taken place for crimes and individuals facially covered by the Amnesty Law. This is because the Public Prosecutor has interpreted the Salvadoran Supreme Court decision to apply the amnesty

law to all cases of human rights abuses. Hrg. Tr. 9/3/04 (Roht–Arriaza), 136:3–20.

127. Aside from the Amnesty Law's blocking prosecution of Saravia for his involvement in the assassination of Archbishop Romero, the passage of the Amnesty Law immediately following the release of the Truth Commission Report served to stifle discussion of the report and frustrated the implementation of its recommendations. This undermined the efficacy and purpose of the entire truth-finding process. Hrg. Tr. 9/3/04 (Roht–Arriaza) 130:16–21, 131:14–19.

G. *Inability to Publicly or Privately Pursue Justice in El Salvador.*

(1) *Fear of Reprisal.*

128. Prior to the first democratically-elected government taking office in El Salvador on June 1, 1994, the military and security forces held enormous power. From 1980 to 1994, any person who made allegations against active or former members of the military risked reprisal, including death. However, citizens did not just fear reprisals by the military. The ARENA party held great power in El Salvador in the 1980s and continues to run the government today. The ARENA party was founded by Roberto D'Aubuisson, who also founded the death squads that operated in direct concert with the Salvadoran armed forces. Salvadorans feared and continue to fear, not only retaliation from the military, but also from the ARENA-run government and its death squads. Complaint, ¶ 22; Hrg. Tr. 8/25/04 (Ramirez Amaya), 26:12–19; 493:3–12, 51:22–52:21.

129. During the civil war, judges were murdered at a high rate. As the Truth Commission concluded, "In the 1980s, it was dangerous to be a judge in El Salvador." During that decade, 28 judges were killed. The judiciary could not defend itself against violence. It "fell victim to intimidation and the foundations were laid

for its corruption... [I]ts ineffectiveness steadily increased until it became, through its inaction or its appalling submissiveness, a factor which contributed to the tragedy suffered by the country." TC Report, pp. 170, 172–73.

130. Even after the security forces were disbanded pursuant to the Peace Accords, Salvadoran courts were still unable or unwilling to hear most claims for human rights violations against individuals for alleged involvement in financing, ordering, assisting, or carrying out death squad killings, including the assassination of Archbishop Romero. Even today, survivors of torture and relatives of killings committed by Salvadoran death squads and the armed forces as far back as the 1970s and early 1980s have declined to bring claims in El Salvador or elsewhere against the individuals responsible, for fear of violent reprisals. Complaint, ¶ 22.

131. J. Doe, specifically, was afraid to bring a case either inside or outside of El Salvador due to risks of violent reprisals against plaintiff and plaintiff's family. Although plaintiff has now brought this case, it is only with the protection of anonymity provided by filing under the name J. Doe. El Salvador remains a dangerous place, but changed circumstances now permit this case to be brought and improved cooperation of witnesses in El Salvador now makes it possible to present this case in a United States Court. Supplemental Declaration of Plaintiff J. Doe, ¶¶ 4–6, filed 9/28/04.

132. Fear is a primary reason that cases have never been brought. The inefficiency and corruption of the El Salvadoran judiciary contributed to the unwillingness of persons to assert claims in the courts of El Salvador. The judiciary bore "tremendous responsibility" for the impunity that persisted during the civil war and displayed a "glaring inability" to investi-

gate crimes, particularly those committed with support of the government. Tutela Legal, the human rights office of the San Salvador archdiocese, brought more than 24,000 cases between 1982 and 1992. Of these, only about five or six were accepted by the courts and eventually all the defendants in those cases received amnesty. TC Report, p. 177–78; Hrg. Tr. 8/26/04 (Hernandez), 125:20–22.

133. The Truth Commission also found that the El Salvador Supreme Court held far too much power, "seriously undermining the independence of lower court judges and lawyers." The Truth Commission recommended that new justices be immediately named to the Supreme Court and that the court's powers be revised. TC Report, p. 177–78, 181.

134. In addition to all these obstacles, El Salvador's 1993 Amnesty Law immunized nearly every person who had committed human rights abuses before and during the civil war. *See* Section V.F., *supra*.

(2) *No Private Prosecutions in Romero Case Due to Fear of Reprisals and Corruption of Salvadoran Judicial System.*

135. No prosecution has ever been brought by Archbishop Romero's family in El Salvador, even though Salvadoran law permits private citizens to initiate criminal proceedings. Victims of a crime, or their relatives, may bring a private accusation for crimes subject to *ex officio* proceedings. As a general rule, a private attorney acting as prosecutor represents the victim and notifies the judge in writing of such representation. Code of Penal Procedure, Art. 50; Hrg. Tr. 8/26/04 (Hernandez), 127:4–13, 129:11–130:10.

136. However, fear of reprisal and the corruption of the judicial system continue to prevent any private prosecution for the Romero assassination. Tutela Legal spoke with two criminal lawyers during the 1980s about bringing a private prosecution on behalf of Archbishop Romero's family, but both refused to take the case for fear of reprisal. Even today private lawyers refuse to bring a private accusation. This specific example reflects the reality that very few private prosecutions have ever been brought for human rights violations and related crimes. Hrg. Tr. 8/26/04 (Hernandez), 127:4–13, 129:11–130; Hrg. Tr. 8/25/04 (Ramirez Amaya), 26:13–16, 52:8–11.

(3) *No State Prosecutions in Romero Case.*

137. Beyond the failed attempt to extradite Saravia, which was abrogated by Salvadoran courts, there have been no prosecutions brought by the Salvadoran government for the assassination of Archbishop Romero. Public prosecutors are selected by the Congress. Congress is controlled by the ARENA party and does not operate in an independent and nonpartisan manner. In practice, public prosecutors will not even consider bringing a state case concerning the assassination. Hrg. Tr. 8/25/04 (Ramirez Amaya), 52:5–7, 17–21; 53:15–45:1.

138. Even the modest efforts to investigate the case were disrupted. The Truth Commission found that the official investigation was "inefficient ... highly controversial and plagued by political motivations." The Supreme Court also actively intervened to prevent Saravia's extradition, thereby ensuring impunity for the perpetrators of the assassination. TC Report, pp. 127–28.

(4) *No Civil Liability in Romero Case.*

139. [REDACTED]

*(5) Deterrent to Earlier Filing.*

140. Due to the continuing climate of repression and active fear of reprisal, plaintiff was effectively inhibited from bringing this case in the courts of El Salvador and the United States. Although United States courts were independent from the intimidation and reprisal operative in El Salvador during the 1990–2003 time period, the plaintiff was subject to fear, intimidation, and was deterred by the example that the prior extradition attempt in a United States District Court had been thwarted by the Salvadoran court.

141. The totality of these conditions effectively barred Plaintiff from earlier filing this human rights case until the Plaintiff's lawyers and supporting organizations facilitated the commencement and prosecution of this case in 2003.

A. *Compensatory Damages.*

142. [REDACTED]

143. [REDACTED]

144. [REDACTED]

145. [REDACTED]

B. *Archbishop Romero's Enduring Legacy.*

(1) *Archbishop Romero's Theological Influence.*

146. Archbishop Romero's legacy within the Roman Catholic Church is immense. The archdiocese of San Salvador, which he served as Archbishop, has formally nominated him to be canonized as a martyr of the church, and the Vatican is presently conducting the formal canonization process. Hrg. Tr. 8/26/04 (Hernandez), 155:18–156:24.

147. Many already refer to him as a saint, often as "Saint Romero of the Americas." Hrg. Tr. 8/24/04 (Wipfler), 79:18–80:11; Hrg. Tr. 8/27/04 (Acosta), 43:15–18; Declaration of Philip Berryman, ¶ 29, filed 8/20/04; Declaration of Rosa Nohemy Or-tiz, ¶ 19, filed 8/20/04; Declaration of Anna Lisa Peterson, Ph.D., ¶ 8, filed 8/20/04; Declaration of Fr. Paul Schindler, ¶ 12, filed 8/20/04; Declaration of Jean Stokan, ¶ 16, filed 8/20/04; Declaration of Thomas Quigley, ¶ 7, filed 8/20/04.

148. In 1988, Westminster Abbey in London unveiled the busts of ten 20th Century martyrs that now stand over the main entrance to that historic church. Archbishop Romero is included, the last of the ten to be killed. Hrg. Tr. 8/27/04 (Guerra), 64:12–16; Declaration of Philip Berryman, ¶ 29, FILED 8/20/04; Declaration of Eileen M. Purcell, ¶ 20, filed 8/20/04.

149. Archbishop Romero's theological influence has been significant, contributing to ideas of the Christian church as the "people of God" rather than as a formal and remote institution; ideas of "accompaniment," which guide Christians in their social and political lives; broader understandings of the Christian concept of martyrdom; new concepts of leadership within the church, particularly priests' and nuns' obligations to exercise a "preferential option for the poor;" and an understanding of the church doctrine known as "Liberation Theology." Declaration of Carlos Ayala Ramirez, ¶ 22, filed 8/20/04; Declaration of Fr. Robert Stuart Pelton, ¶¶ 9–11, filed 8/20/04; Declaration of Anna Lisa Peterson, Ph.D., ¶ 4, filed 8/20/04; Declaration of Eileen M. Purcell, ¶ 22, filed 8/20/04; Declaration of Juan Sobrino y Pastor, S.J., ¶¶ 5–7, filed 8/20/04; Declaration of Prof. Juan Jose Tomayo Acosta, ¶¶ 9–10, filed 8/20/04.

150. In addition to his contribution to ideas, the model of his actions embodies this theology manifested by his religious and spiritual practices. The most evident example is his courageous denunciations of human rights abuses. Hrg. Tr. 8/24/04 (Gumbleton), 164:12–166:4; Declaration of Philip Berryman, ¶¶ 27–28, filed 8/20/04;

Declaration of Anna Lisa Peterson, Ph.D., ¶ 5, filed 8/20/04.

(2) *Archbishop Romero's International Influence as a Proponent of Human Rights and Non–Violence.*

151. Archbishop Romero's courageous defense of human rights, his solidarity with the poor, and his commitment to non-violence and democracy, all rooted in a deep and abiding respect for the dignity of all human beings, in the face of real and continuing mortal intimidation which resulted in his assassination, have been an inspiring model to the world. During his life he came to be known as the "Voice of the Voiceless," and this model has stood for nearly 25 years as one of the world's most revered beacons of hope. He has been compared to Martin Luther King, Jr., and Mahatma Gandhi. Hrg. Tr. 8/24/04 (Wipfler), 80:12–81:17; Hrg. Tr. 8/27/04 (Acosta), 43:12–14, 44:6–9; Declaration of President Oscar Arias Sánchez, ¶¶ 11–13, filed 8/20/04; Declaration of Carlos Ayala Ramirez, ¶ 13, filed 8/20/04; Declaration of Maria Catriona Elena Bain de Alvarenza, ¶ 7, filed 8/20/04; Declaration of Representative Michael D. Barnes, ¶ V, filed 8/20/04; Declaration of Hector Miguel Antonio Dada Hirezi, ¶ 25, filed 8/20/04; Declaration of Representative George Miller, ¶ 11, filed 8/20/04; Declaration of Adolfo Perez Esquivel, ¶ 11, filed 8/20/04; Declaration of Eileen M. Purcell, ¶ 22, filed 8/20/04; Declaration of Jean Stokan, ¶ 15, filed 8/20/04; Declaration of Archbishop Desmond Mpilo Tutu, ¶ 4, filed 9/20/04.

152. The impact of his murder is partially captured through literature and art. Plays honoring him have been produced worldwide, including the United States, France, and Germany. Numerous biographies have been published about him in French, German, Italian, English, Spanish, and Portuguese. There is a major motion picture about his death; there are medical clinics, student scholarships, community centers, and scholarship programs bearing his name. Hrg. Tr. 9/3/04 (Karl) 73:8–74:3.

153. Archbishop Romero's legacy as a continuing beacon of hope is manifest. Each March 24, there are religious services, memorials and marches in his memory all over the world. Hrg. Tr. 8/24/04 (Gumbleton), 165:24–166:15; Hrg. Tr. 8/27/04 (Guerra), 64:20–66:5; Exs. 78–82 (photos of memorials).

C. *Due to His Stature and the Unique Role that he Played Within El Salvador, the Damages Caused by the Assassination of Archbishop Romero Have Been Profound.*

(1) *Loss of El Salvador's Primary Mediator/Bridge.*

154. Archbishop Romero was widely recognized as the one person who could act as a bridge between the divided sectors of Salvadoran society. He was able to mediate labor disputes and many other types of conflicts because he was the one figure in El Salvador who was consistently respected and listened to by all sides. He was viewed by the U.S. government and many others as essential to any nonviolent or less-violent resolution of the crisis gripping El Salvador at the time. Hrg. Tr. 8/25/04 (White), [White Dep. 21:1–22:5]; Hrg. Tr. 9/3/04 (Karl), 74:13–23.

(2) *The Assassination of Archbishop Romero was a Major Catalytic Event that Helped to Precipitate El Salvador's Civil War.*

155. Archbishop Romero acted as a critical bridge between the polarized sectors of Salvadoran society. Eliminating that bridge helped drive El Salvador into civil war. His killing—and the absolute impunity that his assassins enjoyed in its aftermath—signaled the futility of nonviolent methods of change. As Robert White,

the then-U.S. Ambassador to El Salvador testified:

Those who killed Monsignor Romero knew perfectly well what they were doing and what they would accomplish. They destroyed the one figure in El Salvador that could have served as a bridge, as a creative interpreter between all the different sides.

And his removal by violence basically sent a signal that—that no dialogue was warranted, that what the Salvadoran rich and military were after was a total pressure of this burgeoning movement towards democratic change.

Hrg. Tr. 8/24/04 (White) [White Dep. 28:15–29:13, 55:13–56:1]; *see also* Hrg. Tr. 9/3/04 (Karl), 74:13–23; Declaration of President Oscar Arias Sánchez, ¶ 7, filed 8/20/04; Declaration of Philip Berryman, ¶ 23, filed 8/20/04; Declaration of Hector Miguel Antonio Dada Hirezi, ¶ 17, filed 8/20/04.

156. The assassination also signaled that no one was safe. The message was clear: "If the Archbishop could be killed with impunity, then anyone could be." Ambassador White testified:

the failure of the Salvadoran military to arrest and keep under arrest Roberto D'Aubuisson and Alvaro Saravia and their fellow conspirators, their failure to try them and convict them and put them into prison was another lesson to the Salvadoran people that impunity in El Salvador was alive and well, that there was no chance of getting justice from the system. And, therefore, the Archbishop not only did it—reinforced the image of a military that was a law unto itself. It also served as a recruiting tool for revolutionaries, because if you can kill an Archbishop, you know, you can kill anybody. No one is sacred.

Hrg. Tr. 8/24/04 (White) [White Dep. 56:2–14]; *see also* Hrg. Tr. 9/03/04 (Karl) 91:20–21; Hrg. Tr. 8/27/04 (Acosta), 35:17–36:1;

Hrg. Tr. 8/26/04 (Cortina), 110:16–20; Declaration of Eileen M. Purcell, ¶ 10, filed 8/20/04; Declaration of Carlos Ayala Ramirez, ¶ 18, filed 8/20/04; Declaration of Plazido Erdozoin Beroiz, ¶ 7, filed 8/20/04; Declaration of Maria Elena Galván de Girón, ¶ 31, filed 8/20/04.

157. Romero's death also fueled support for both the unarmed and armed left, further polarizing the country. In April 1980, shortly after his murder, the Frente Democratico Revolucionario ("FDR") formed; it was the first organization in the history of El Salvador to unite all factions of the left and much of the center, reflecting the extent to which the actions of the military had destroyed the political center and driven its remnants to ally with the left. Archbishop Romero became their rallying cry and a major symbol for recruitment. Hrg. Tr. 8/24/04 (White) [White Dep. 56:1–57:1]; Hrg. Tr. 9/3/04 (Karl), 75:24–76:19.

158. As repression continued, this also fueled the establishment of a guerrilla army, which by the end of 1980, grew from five small armed factions to the Frente Farabundo Marti para la Liberacion Nacional ("FMLN"). In effect, the extraordinary state terror launched by the military and security forces united the armed left into a single command and produced the formation of a guerrilla army—an action they had never been able to achieve previously. Hrg. Tr. 9/3/04 (Karl) 76:25–78:5.

159. With two armies confronting each other, El Salvador had moved from widespread social conflict to a state of civil war. Hrg. Tr. 9/3/04 (Karl) 78:2–5.

160. Other prominent members of the nonviolent opposition were murdered in the ensuing months, along with hundreds of less prominent individuals. In November of 1980, six political leaders of the nonviolent FDR were killed by the armed forces. Hrg. Tr. 9/3/04 (Karl), 76:20–77:7;

Hrg. Tr. 8/26/04 (Hernandez), 160:20–161:23.

161. The civil war between the Salvadoran government and the FMLN raged for the next 11 years. TC Report, pp. 28–29 and 58–62; Exs. 67–72 (photos of death squad victims). ,

162. Murders in El Salvador increased significantly following the Archbishop's death, further immersing the country in violence. The month prior to his death (February 1980) 237 people were killed; by June 1980, the number had grown to 1,000. Hrg. Tr. 9/3/04 (Karl) 79:16–80:5.

163. The number of murders following the Archbishop's assassination increased yearly. While approximately 1,000 civilians were killed in 1979, this figure rose to well over 11,000 in 1980 and 16,000 in 1981. Many of the civilians killed were young. As Ambassador White testified, "in the great majority, these were the killing of unarmed civilians, most of them young, young men, young boys that were just rounded up and herded and gunned down execution style. So, it was terrible. I mean, I'd seen enough dead 15 year olds to, you know, to last me the rest of my life." Hrg. Tr. 8/24/04 (White) [White Dep. 24:21–25:5]; see also Hrg. Tr. 9/3/04 (Karl) 83:17–21.

164. By the end of the war, estimates of civilian dead ranged from 75,000 (USAID) to 80,000 (World Bank), far higher on a per capita basis than in other cases of state terror such as Chile or Argentina. Hrg. Tr. 9/3/04 (Karl), 78:8–13, 83:22–84:7.

165. The military, security forces and death squads were responsible for "almost 85 percent" of these murders. TC Report, p. 43.

166. In addition to the incalculable cost of the thousands of lost lives, the economic damage was severe. The damage to El Salvador's infrastructure is estimated at $2.2 billion, including the destruction of schools, hospitals, and clinics. Hrg. Tr. 9/03/04 (Karl), 84:23–85:4.

167. The disruption of livelihoods and the profound dislocation of economy and society resulted in the decrease in domestic investment, the most important indicator of a country's growth, from 22% of GDP in 1979 to 12% in 1989, despite huge increases in U.S. aid. The real GDP declined by 12% during the 1980s, and per capita income dropped 25%. From a development perspective, this has been a generation of loss. By the end of the war, for example, health expenditures were a third of the Latin America average, illiteracy was almost twice the Latin American average, and infant mortality was significantly higher than the Latin American average. Hrg. Tr. 9/3/04 (Karl), 85:12–86:23.

(3) *More than One Million Salvadorans Driven into Exile.*

168. At least 1.2 million Salvadorans—roughly one-fifth of the population—were forced into exile during the civil war that followed the assassination of Archbishop Romero. In addition, more than 600,000 Salvadorans were internally displaced within the country. Hrg. Tr. 9/3/04 (Karl), 87:3–10.

169. One of these refugees was Francisco Acosta Arevalo. A student of the Jesuit University of Central America, he was forced to sleep outside for days to avoid attacks by security forces and death squads. He was given an offer to join an armed opposition group, but declined due to his nonviolent principles. He believed his only alternative was to flee the country. Seventy-two of Mr. Acosta's relatives were killed during the war. His family is now dispersed among 14 countries, and they speak nine different languages. Hrg. Tr. 8/27/04 (Acosta), 36:2–38:22, 45:5–12.

170. Another typical member of the Salvadoran diaspora is Esther Chavez.

She came under the suspicion of the Treasury Police when she organized a day care center for children. She had to flee the country after her father was captured. She stated that when she left in October 1980:

I have mixed feeling regarding that I was in some way betraying my community. Because of my family's condition, I was able to leave the country. But the majority of people that was [sic] involved, they didn't have that chance. And that's why I felt I was betraying my community and my belief.

And I was hoping that in two years, I would be able to go back and continue to work. But two years came to be four, six and many years.

Hrg. Tr. 8/27/04 (Chavez), 14:22–16:11; 15:13–21.

### (4) *The Killing was Particularly Brutal.*

171. The very public nature of Archbishop Romero's assassination made it brutal to those who experienced the loss. As Archbishop Desmond Mpilo Tutu testified, "His assassination in public, with his people, was reminiscent of the assassination of another great man, Mahatma Gandhi. Such a brutal act demonstrated the arrogance of the perpetrators, their total disrespect for life and confidence in their impunity." Declaration of Desmond Mpilo Tutu, ¶ 4, filed 9/3/04.

172. The killing of Archbishop Romero was of a different character from many other atrocities in El Salvador, a sniper's bullet as opposed to accounts of torture and grotesque brutality. The powerful symbolism of Archbishop Romero's killing was just as brutal. He was killed while celebrating mass. The intentional profaning of the sacred, perpetrating an attack upon a faith deeply shared by the people. One eyewitness, a nun, described the killing:

I was in the left wing, four meters away from the altar of the Temple of Atonement that he had dedicated with oil on the sixteenth of July one thousand nine hundred and seventy-four, and which this day he consecrated with his own blood at six fifteen in the afternoon. In his homily he made reference to "the grain of wheat that can't give life if it does not die," as though he felt this would be his Post humus [sic] Mass. During his homily he kept his eye on the main door, but then he moved to the center of the Altar to lay out the corporal before beginning the offertory. In that moment from the main door an assassin's bullet entered rapidly and exploded his heart. Due to the instinct of conservation, Monseñor Romero grabbed the table of the Altar and pulled the tablecloth onto which the hosts fell without being consecrated, and Monseñor fell at the feet of Christ, who had been his faithful model since his childhood, his youth, as a Priest, as a Bishop and as an Archbishop. In our Religious Community we interpreted this painful event as God saying, "TODAY I DON'T WANT YOU TO OFFER BREAD AND WINE AS ALWAYS. TODAY YOU WILL BE THE VICTIM, OSCAR."

Declaration of Maria de la Luz Cueva Santana, ¶ 6, filed 8/20/04.

173. This symbolism affected those who were not Catholic as well. An Evangelical minister, Raúl Lopez Pacheco, testified as follows:

What shocked me the most about the death of Monseñor Romero was the cruelty of the moment in which he was assassinated. For the entire Christian community the moment most noble and sacred is the presentation of the bread as the body of Christ; this has many implications because it was precisely at

this point during mass when he was assassinated.

Declaration of Raúl Lopez Pacheco, ¶ 8, filed 8/20/04; *see also* Declaration of Miguel Tomas Castro Garcia, ¶ 5, filed 8/20/04 (also a Protestant minister).

174. The killing of Archbishop Romero was part of an overall strategy of the junta to attack the church, particularly the adherents of Liberation Theology. Killing the country's foremost religious leader while celebrating mass most powerfully expressed this war on the church. Killing Romero in this way sent a message of terror and intimidation to all who shared his commitment to the faith.

(5) *It Became more Dangerous to Worship Following Archbishop Romero's Murder.*

175. Archbishop Romero's killing served to unleash still more terror directed against the church in El Salvador. More priests were killed or driven into exile, many hundreds of catechists (lay church activists) were killed, and it became increasingly dangerous and difficult to participate in any religious services. Some worshipers were forced to practice their faith clandestinely. Hrg. Tr. 8/27/04 (Guerra), 66:13–67:10; Hrg. Tr. 8/26/04 (Hernandez), 161:3–18; Hrg. Tr. 8/27/04 (Chavez), 11:3–12:5, Declaration of Rosa Nohemy Ortiz, ¶¶ 11 & 15, filed 8/20/04; Declaration of Rigoberta Menchú Tum, ¶¶ 6–7, filed 8/20/04; Maria Catriona Elena Bain de Alvarenga, ¶¶ 6 & 8, filed 8/20/04; Declaration of Maria Clelia Flores Iraheta, ¶ 14, filed 8/20/04.

(6) *The People Were Deprived of Their Protector.*

176. The death of Archbishop Romero caused many to feel that they were without protection from the repression. For many, his role as the "Voice of the Voiceless," meant that he was their only protec-

tion against attack. Many felt profoundly bereft and afraid. Hrg. Tr. 8/26/04 (Cortina), 110:21–22; Declaration of Maria Elena Galván de Girón, ¶¶ 29–30, filed 8/20/04.

177. The loss of the one who was their protector created an atmosphere of fear that was acutely felt. *See, e.g.,* Declaration of Meria Leonor del Carmen Chacón, ¶¶ 5 & 7, filed 8/20/04.

(7) *Many Shared a Sense of Profound Loss, as Archbishop Romero was Revered by many Almost as a Member of their Family.*

178. Julia Elvira Chacón is a housewife who first met Archbishop Romero in 1963. Whenever he was in her town, he would drop in and she would "make some beans and a hot sauce the way he liked them." On March 24, 1980, her brother-in-law told her that he was there in her town, and so she went home to make dinner for him. The table was ready when she received the news that he had been killed. She is an old woman now, but that memory persists. There will always be an empty place at her table. Declaration of Julia Elvira Chacón, ¶¶ 5–6 & 14, filed 8/20/04.

179. Sara Sorto de Lopez, a dressmaker, testified that she was "greatly impacted by the death of Monsenor Romero," and recalled that he "enjoyed listening to the marimba and he came to my house to listen to it being played." Declaration of Sara Sorto de Lopez, ¶¶ 5 & 7, filed 8/20/04.

180. The death of Archbishop Romero caused many to experience profound sadness and horror. *See, e.g.,* Declaration of Anay Emerita Gonzalez de Sosa, ¶ 5, filed 8/20/04; Declaration of Concha Marina del Carmen Leiva Argueta, ¶ 6, filed 8/20/04; Declaration of Rigoberto Membreno, ¶ 8, filed 8/20/04; Declaration of Ramon Eleazar Moran Colorado, ¶ 7, filed 8/20/04;

Declaration of Maria Leonor del Carmen Chacon de Romero, ¶ 7, filed 8/20/04.

181. One reason that so many so personally felt the loss was the presence Archbishop Romero represented in their lives. Most of the country heard his homilies broadcast every Sunday. One could walk from village to village in the countryside and not miss a word, as it was heard from radios in every house and hut along the way. Hrg. Tr. 8/24/04 (White) [White Dep. 15:20–16:7]; Declaration of Fr. Paul Schindler, ¶ 5, filed 8/20/04; Declaration of Transito Ruano de Castro, ¶ 4, filed 8/20/04.

(8) *The Impact of the Killing has been Great and has Reached Sociological Dimensions.*

182. The brutal, public and highly symbolic murder of Archbishop Romero, the "Voice of the Voiceless," during a troubled time in El Salvador's history when the country teetered on the brink of civil war, has had a profound impact upon those who survived the ensuing war, whether within El Salvador or among those who fled. Feelings of helplessness, powerlessness, fear, and genuine despair, within both the spiritual and social realms were experienced by many, and many were overwhelmed. A psychologist who works with refugees, Felix Kury, testified to this:

Healing the scars of war and violence of these refugees is a difficult task. And it might be that all these activities help alleviate their suffering. For many of the relatives of the 75,000 civilians that were killed in the last twenty years, healing takes a quite different and profound meaning. Families will have to perceive that their loss and pain were not in vain. Since "El Dolor" (their pain) was collective, healing will also have to be in a dialectic process that comes from the social to the particular individual situation.

Declaration of Felix Kury, ¶ 5, filed 8/20/04; *see also* Hrg. Tr. 9/3/04 (Karl), 87:14–89:1.

183. Holding accountable those responsible for Archbishop Romero's murder is one means to facilitate this healing. Declaration of Felix Kury, ¶ 5, filed 8/20/04 ("The trial of individuals involved in the death of Romero would be a significant part of the healing of all Salvadorans everywhere."). As Francisco Acosta testified,

To me personally, and I am for sure for the members of my family, the point is: Should we forget? Should we forgive? How can we move on? Because this is heavy in misery for us. Extremely heavy. The fact I was invited to be a witness in this time, in this place, is a way to get a closure, saying, justice is done. I can move on in my life.

Hrg. Tr. 8/27/04 (Acosta), 45:17–23.

## CONCLUSIONS OF LAW

I. *SUBJECT MATTER JURISDICTION.*

184. Plaintiff brings this case under the Alien Tort Claims Act, 28 U.S.C. § 1350 (the "ATCA"), and the Torture Victim Protection Act, Pub.L. No. 102–256, 106 Stat. 73 (1993) (codified at 28 U.S.C. § 1350 note) (the "TVPA"). This Court has jurisdiction over this action under the ATCA and 28 U.S.C. § 1331.

II. *PERSONAL JURISDICTION.*

185. This Court has personal jurisdiction over Defendant Saravia, who is or was a resident in Modesto, California, at the time this action commenced and who continues to receive mail at 2401 Manor Oak Drive, Modesto, California 95355, where he was served with process in the Eastern District of California.

■ 186. Substitute service was affected on September 15 and October 18, 2003, following attempts to serve the defendant personally, by leaving a copy of the papers with the owner of 2401 Manor Oak Drive, Modesto, California 95355, the address at which Saravia had been residing and at which he is continuing to receive mail, and by then mailing the papers to Saravia at the Modesto address. Proof of Service, filed January 9, 2004.

187. Service is valid under Fed. Rule Civ. P. 4(e)(1), which permits service "pursuant to the law of the state in which the district court is located," and California Code Civ. P. § 415.20(b), which authorizes service at a person's "usual mailing address other than a United States Postal Service post office box, in the presence of a competent ... person apparently in charge of his or her office, place of business or usual mailing address ..., at least 18 years of age, who shall be informed of the contents thereof, and by thereafter mailing a copy of the summons and of the complaint ... to the person to be served at the place where a copy of the summons and complaint were left ...."

188. A registered process server served the Summons and Complaint and related papers on the owner of the usual mailing address for Saravia, personally on October 18, 2003, and explained the nature of the papers, and thereafter by mail on October 21, 2003, to Defendant's usual mailing address, 2401 Manor Oak Drive, Modesto, California 95355.

189. Based on a verified declaration under penalty of perjury of substituted service, the Court entered Saravia's default by Order of the Clerk dated April 13, 2004.

■ 190. Substitute service has been made on the correct Alvaro Rafael Saravia. The Alvaro Rafael Saravia who was living at and continues to receive mail at 2401 Manor Oak Drive, Modesto, California, shares the same birthdate—February 16, 1946—with the Alvaro Rafael Saravia sought to be extradited to El Salvador to face charges in connection with the assassination of Archbishop Romero. Smith Decl. ¶¶ 4–5, Ex. A; Criminal Complaint, *U.S. v. Alvaro Rafael Saravia Merino,* 11/25/87, and supporting affidavit of Sharon L. Kegerreis, ¶ 5. That same report shows that Saravia is associated with a previous address in Florida and has a Social Security Number issued in Florida between 1985 and 1986, where he was known to be living at the time the extradition proceedings commenced. Smith Decl. ¶¶ 4–5. Ms. Olsson, who lived at and owns the 2401 Manor Oak Drive residence met Saravia in Miami, told Saravia about the type of city Modesto was, and Saravia moved to Modesto. Ms. Olsson was told by Saravia that he had family in Miami and Ms. Olsson knows that Saravia used to be in the Salvadoran Air Force. Kaufman Decl. ¶¶ 4–5.

191. The evidence preponderates that the correct Alvaro Rafael Saravia was validly served with the Summons and Complaint in Modesto, California, on September 15 and October 18 and 21, 2003.

## III. *DEFAULT PROCEEDING.*

■ 192. The entry of default deems Saravia to have admitted every well-pleaded allegation of the complaint except those relating to damages. *Bender Shipbuilding & Repair Co., Inc. v. The Vessel DRIVE OCEAN V.,* 123 F.Supp.2d 1201, 1208 (S.D.Cal.1998); *see also United States v. Woody,* No. CIV.S–98–0442, 1999 U.S. Dist. LEXIS 9088 (E.D. Cal. June 2, 1999). The entry of default conclusively establishes a defendant's liability. *Adriana Int'l Corp. v. Thoeren,* 913 F.2d 1406, 1414 (9th Cir.1990); *Bender Shipbldg. & Repair,* 123 F.Supp.2d at 1208; *Taylor Made Golf Co., Inc. v. Carsten Sports,*

*Ltd.,* 175 F.R.D. 658, 661 (S.D.Cal.1997); *United States v. Wight,* No. CIV.S–98–0442, 2001 U.S. Dist. LEXIS 22785 (E.D.Cal. Dec. 14, 2001).

■ 193. Here, the facts pleaded in the Complaint establish Plaintiff's claims of extrajudicial killing in violation of the TVPA and extrajudicial killing and crimes against humanity in violation of the ATCA. This alone is sufficient to establish Saravia's liability, although Plaintiff also has presented independent evidence in support of its claim, and evidence to establish its damages. Fed.R.Civ.P. 55(b).

## IV. *LIABILITY UNDER THE TVPA AND ATCA*

### A. *The Statutory Scheme.*

#### (1) *ATCA.*

194. The ATCA states:

The district courts shall have original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States.

28 U.S.C. § 1350.

■ 195. In *Sosa v. Alvarez–Machain,* the United States Supreme Court held that the ATCA gives federal courts jurisdiction to hear claims by an alien for torts in violation of the law of nations. It does not itself provide a cause of action, but provides jurisdiction over certain international law claims, to the extent those claims have been incorporated into the common law. As the Court explained:

In sum, although the [ATCA] is a jurisdictional statute creating no new causes of action, the reasonable inference from the historical materials is that the statute was intended to have practical effect the moment it became law. The jurisdictional grant is best read as having been enacted on the understanding that the common law would provide a cause of action for the modest number of in-

ternational law violations with a potential for personal liability at the time.

*Sosa v. Alvarez–Machain,* —— U.S. ——, ——, 124 S.Ct. 2739, 2761, 159 L.Ed.2d 718 (2004).

196. When the ATCA was enacted in 1789, only three torts were recognized under the common law as being violations of the law of nations "with a potential for personal liability:" violation of safe conduct, infringement of the rights of ambassadors, and piracy. *Id.* at 2761.

■ 197. A majority of the Court found, however, that the "international law violations" recognized by federal common law did not remain frozen as of 1789. "We assume, too, that no development in the two centuries from the enactment of § 1350 to the birth of the modern line of cases beginning with *Filartiga v. Pena–Irala,* 630 F.2d 876 (2d Cir.1980), has categorically precluded federal courts from recognizing a claim under the law of nations as an element of common law; Congress has not in any relevant way amended § 1350 or limited civil common law power by another statute." *Sosa,* 124 S.Ct. at 2761. However, the recognition of a claim under the "present-day law of nations" as an element of common law is circumscribed to "norm[s] of international character accepted by the civilized world and defined with a specificity comparable to the features of the 18th-century paradigms we have recognized." *Id.* at 2761–2762.

■ 198. The norms amenable to being the subject of the ATCA must be "specific, universal and obligatory." *Id.* at 2765.

■ 199. As described below, both extrajudicial killing and crimes against humanity meet the specific, universal and obligatory standard.

(2) *TVPA.*

200. The TVPA was passed by Congress in 1991 and enacted in 1992. 106 Stat. 83 (passed Mar. 12, 1992). It sets forth an unambiguous and separate jurisdictional basis for civil actions in federal courts for redress against the acts of extrajudicial killing and torture. S.Rep. No. 102–249, p. 3 (1991); H.R.Rep. No. 102–367, pp. 2–3 (1991). The TVPA was intended explicitly to ratify the ATC by denoting that aliens also can bring a claim under its aegis. H.R.Rep. No. 102–367, pp. 3–4 (1991). Further, the TVPA extended the civil remedy to United States citizens. S.Rep. No. 102–249, p. 3 (1991); H.R.Rep. No. 367, p. 3 (1991).[2]

201. As the U.S. Supreme Court recently stated in *Sosa*, "[A] clear mandate appears in the Torture Victim Protection Act of 1991, 106 Stat. 73, providing authority that 'establish[es] an unambiguous and modern basis for' federal claims of torture and extrajudicial killing." H.R.Rep. No. 102–367, pt. 1, p. 3 (1993); *Sosa*, 124 S.Ct. at 2763.

202. The TVPA states:

2.(a) An individual who, under actual or apparent authority, or color of law, of any foreign nation ... (2) subjects an individual to an extrajudicial killing shall, in a civil action, be liable for damages to the individual's legal representative, or to any person who may be a claimant in an action for wrongful death. 28 U.S.C. § 1350 (note).

203. Although the TVPA provides a statutory basis for a claim for extrajudicial killing, the enactment of the TVPA did not diminish the scope of the ATCA in any way. *Kadic v. Karadzic*, 70 F.3d 232, 241 (2d Cir.1995) ("[t]he scope of the Alien Tort Act remains undiminished

by enactment of the Torture Victim Act."); *see also Wiwa v. Royal Dutch Petroleum Company*, No. 96 CIV.8386, 2002 WL 319887, *4 (S.D.N.Y. Feb.28, 2002) ("This Court reads *Kadic I* to hold that the TVPA did not preempt torture and summary execution claims under the ATCA.... In fact, no court that has evaluated ATCA claims since the enactment of the TVPA has held that the TVPA in any way preempts ATCA claims for torture and extrajudicial killings .... [T]he TVPA simply provides an additional basis for assertion of claims for torture and extrajudicial killing."); *see also* S.Rep. No. 102–249, p. 3 (1991) ("The ATCA has ... important uses and should not be replaced"); *accord* H.R.Rep. No. 102–367, p. 3 (1991). Plaintiff may assert a claim for extrajudicial killing under both the TVPA and ATCA.

**B. Plaintiff Has Standing to Bring This Action Under the TVPA and ATCA.**

(1) *TVPA.*

204. [REDACTED]

205. [REDACTED]

206. [REDACTED]

(2) *ATCA.*

207. The ATCA has no explicit standing requirements. To ascertain, however, whether Plaintiff has standing to bring a claim under the ATCA, the Court either follows the approach of the TVPA to look to California law (which establishes standing here), or employs a choice of laws analysis to look to Salvadoran law. *See Alvarez–Machain v. U.S.*, 331 F.3d 604, 632–33 (9th Cir.2003) (employing choice of law analysis) (issue not reached by the United States Supreme Court in *Sosa v.*

---

**2.** A federal court also has jurisdiction over a claim brought by a U.S. citizen under the TVPA pursuant to its general federal question jurisdiction under 28 U.S.C. § 1331. *Estate of Cabello v. Fernandez–Larios*, 157 F.Supp.2d 1345, 1355 (S.D.Fla.2001) (citing cases).

*Alvarez–Machain,* 540 U.S. 1045, 124 S.Ct. 807, 157 L.Ed.2d 692 (2003)). The former approach, was adopted in *Xuncax v. Gramajo,* 886 F.Supp. 162, 191 (D.Mass.1995); *cf. Papa v. U.S.,* 281 F.3d 1004, 1012 (9th Cir.2002) (finding TVPA closest analogue to ATCA for purposes of determining statute of limitations under ATCA). The application of Salvadoran law does not affect the outcome.

### (3) *Salvadoran Law.*

208. If a choice of law analysis is undertaken, the Court looks to the law of El Salvador, but only to the extent it does not frustrate the purpose of the ATCA. *See Tachiona v. Mugabe,* 234 F.Supp.2d 401, 419 (S.D.N.Y.2002) (choice of law determination should not compel "dispositive application of foreign law where the municipal rule of decision may conflict with federal law or international standards"); *see also Filartiga v. Pena–Irala,* 577 F.Supp. 860, 863–64 (E.D.N.Y.1984) ("the court should consider the interests of Paraguay to the extent they do not inhibit the appropriate enforcement of the applicable international law or conflict with the public policy of the United States").

209. [REDACTED]

210. In El Salvador, a civil law jurisdiction, a civil action for wrongful death may be brought only in connection with a criminal action, as part of the penal proceeding. The civil proceeding arises from criminal responsibility. *See* Salvadoran Civil Code Art.2065 ("the person who commits a felony or a misdemeanor has the obligation to compensate, independently of the punishment established by the law for that particular fact."); *see also* Art. 114, 115, 116, 117 & 130 of the Penal Code; Art. 69 and 89 of the Code of Penal Procedure; Hrg. Tr. 8/25/04 (Ramirez Amaya), 47:6–10; Noya Decl. ¶¶ 3, 4.

211. [REDACTED]

### C. *Equitable Tolling Avoids the Bar of the Statute of Limitations.*

212. Plaintiff filed the Complaint on September 12, 2003. Although there is no express limitation period prescribed by the ATCA, the Ninth Circuit has held the applicable limitations period to be the 10–year period set out in the TVPA. U.S.C. § 1350, (note) § 2(c) 28; *Papa v. U.S.,* 281 F.3d at 1012 ("the statute of limitations applicable to the ATCA is that provided by the TVPA.")

213. Courts, however, have held that the 10–year TVPA limitation period is subject to equitable tolling. *Hilao v. Marcos,* 103 F.3d 767, 773 (9th Cir.1996); *Cabello,* 157 F.Supp.2d at 1367–68 citing cases and quoting H.R.Rep. No. 102–367, at 5 (1991). The *Cabello* court concluded that "the TVPA's ten-year limitations period is equitably tolled, where either '(1) defendant's wrongful conduct prevented plaintiff from asserting the claim; or (2) extraordinary circumstances outside the plaintiff's control made it impossible to timely assert the claim.' " *Id.* at 1368 (*quoting Doe v. Unocal Corp.,* 963 F.Supp. 880, 897 (C.D.Cal.1997) (opinion vacated on other grounds by *Doe v. Unocal Corp.,* 395 F.3d 978, 2003 WL 359787 (9th Cir. Feb.14, 2003)) and citing *Forti v. Suarez–Mason,* 672 F.Supp. 1531, 1549 (N.D.Cal. 1987)). This is consistent with the policy expressed by the Court in *Forti,* 672 F.Supp. at 1548, "of providing a forum for claims of violations of internationally recognized human rights." *See also,* S. Rep. 102–249, p. 10 ("the legislation provides for a 10–year statute of limitations, but explicitly calls for consideration of all equitable tolling principles in calculating this period with a view toward giving justice to Plaintiff's rights.").

214. *Forti* held that the inability to obtain justice from Argentina's courts could

provide a basis for tolling the limitation period:

> Plaintiffs claim that it was impossible for them to gain relief for defendant's wrongdoing n the courts of Argentina from the time their claims accrued until the demoncratically-elected [*sic*] government assumed power. As defendant points out, plaintiffs were not actually denied access to the Argentine courts. Nominally, the Argentine courts retained their powers to adjudicate civil claims against military officers and to grant habeas relief. *As a practical matter, however, access to Argentine courts may have been denied to plaintiffs. Plaintiffs present facts indicating that the court retained of its powers over the military in form only and that effectively, no relief was or could be granted by the Argentine courts. Additionally, given the pervasiveness of the military's reign of terror, it may be possible for plaintiffs to demonstrate that members of the judiciary neglected to apply laws granting relief out of fear of becoming the next victim of the "dirty war."*

672 F.Supp. at 1550 (emphasis added).

 215. In this case, there is clear support in the Complaint and in the record for tolling the limitations period. As in *Forti*, Plaintiff could not have obtained justice from Salvadoran courts as a result of Plaintiff's lawyers, and some judges' objective and reasonable fear of retaliation or judicial complicity with the repressive regime. This fear extended to proceedings brought outside of El Salvador as well. Supplemental Declaration of Plaintiff J. Doe, ¶ 4, filed 9/28/04.

216. The evidence is that from 1980 to 1994, and even through to the present, any person who leveled allegations against active or former members of the military risked reprisal, including death. Complaint, ¶ 22, Hrg. Tr. 8/25/04 (Ramirez Amaya), 26:12–19. Salvadorans also feared retaliation from the ARENA-run government and its death squads, which worked closely with the armed forces. Hrg. Tr. 8/25/04 (Ramirez Amaya), 52:12–21.

217. Judges were murdered at a high rate. As the Truth Commission concluded, "In the 1980s, it was dangerous to be a judge in El Salvador," and during that decade, 28 judges were killed. TC Report, p. 170. The judiciary had little power to defend itself against violence. It "fell victim to intimidation and the foundations were laid for its corruption.... [I]ts ineffectiveness steadily increased until it became, through its inaction or its appalling submissiveness, a factor which contributed to the tragedy suffered by the country." TC Report, pp. 172–73.

218. "Even after the Salvadoran security forces were disbanded pursuant to the Peace Accords, Salvadoran courts were still unable or unwilling to hear most claims for human rights violations against individuals for alleged involvement in financing, ordering, assisting, or carrying out death squad killings, including the assassination of Archbishop Romero." Complaint, ¶¶ 22, Hrg. Tr. 8/26/04 (Hernandez), 127:6–13, 129:11–130:10; Hrg. Tr. 9/03/04 (Karl) 51:19–25. "Even today, survivors of torture and relatives of killings committed by Salvadoran death squads and the armed forces as far back as the 1970s and early 1980s have declined to bring claims in El Salvador or elsewhere against the individuals responsible for fear of violent reprisals." Complaint, ¶ 22, Hrg. Tr. 9/3/04 (Karl) 88:21–89:1. In fact, the plaintiff has brought this case under a pseudonym precisely because of fear of reprisals.

219. Due to this same fear of violent reprisals, plaintiff was unable to bring this claim in a U.S. Court earlier. Although plaintiff has now brought this case, it is only with the protection of filing under the

pseudonym J. Doe. El Salvador remains a dangerous place, but changes in the country have now allowed plaintiff's attorneys to investigate the case and obtain the cooperation of witnesses in El Salvador. Supplemental Declaration of J. Doe, ¶¶ 4–5, filed 9/28/04.

220. In thwarting extradition of Defendant Saravia, in judicially validating Amnesty laws, and in rejecting direct, credible evidence of Defendant's participation in the assassination, the courts of El Salvador have foreclosed the opportunity for plaintiff's case to be maintained before the judicial system of El Salvador and have evidenced their inability and unwillingness to provide a fair, honest, and reliable forum for the hearing of Plaintiff's claims.

221. For these reasons, the 10–year limitation period applicable to the TVPA and ATCA has been equitably tolled through the date of filing of the complaint, September 12, 2003.

### D. *Defendant is Liable Under the TVPA for Extrajudicial Killing.*

222. Under the TVPA,

2.(a) An individual who, under actual or apparent authority, or color of law, of any foreign nation ... (2) subjects an individual to an extrajudicial killing shall, in a civil action, be liable for damages to the individual's legal representative, or to any person who may be a claimant in an action for wrongful death.

28 U.S.C. § 1350 (note).

223. Extrajudicial killing is defined as "a deliberate killing not authorized by a previous judgment pronounced by a regularly constituted court affording all the judicial guarantees which are recognized as indispensable by civilized peoples." *Id.* at § 3(a). The TVPA also requires that a plaintiff exhaust "adequate and available" local remedies and provides a ten-year statute of limitations. *Id.* at § 2(b) and (c).

### (1) *Saravia's Role in the Assassination.*

224. Saravia's role in coordinating and planning the assassination of Archbishop Romero is sufficient to establish liability against him under the TVPA and ATCA as a direct participant, conspirator, accomplice, and aider and abettor.

225. In *Tachiona v. Mugabe*, 216 F.Supp.2d 262, 270 (S.D.N.Y.2002) the court found members of Zimbabwe's ruling party liable under the TVPA for "organiz[ing] targeted violence against political opponents and their families and supporters, assassinations and assassination attempts, kidnappings, tortures, rapes, beatings, mass destruction of property, and mob riots in a consistent and focused campaign of terror designed to crush political opposition to ZANU–PF." Other cases have found defendants liable for authorizing or directing torture or killings. *See, e.g., Kadic*, 70 F.3d at 232.

226. As explained by the Court in *Mehinovic v. Vuckovic*, 198 F.Supp.2d 1322 (N.D.Ga.2002), the TVPA encompasses the liability of accomplices:

United States Courts have recognized that principles of accomplice liability apply under the ATCA to those who assist others in the commission of torts that violate customary international law. Similarly, the Senate report on the TVPA notes that that statute is intended to apply to those who "ordered, abetted, or assisted" in the violation.

Principles of accomplice liability are well-established under international law. Relevant international conventions explicitly provide that those who assist in the commission of acts prohibited by international law may be held individually responsible.

[Under the International Criminal Tribunal for the Former Yugoslavia], it is

sufficient that the accomplice knows that his or her actions will assist the perpetrator in the commission of the crime. *Id.* at 1355–56 (footnotes omitted); *see also Wiwa,* 2002 WL 319887 at *16 ("the Court finds that the language and legislative history of the TVPA supports liability for aiders and abettors of torture and extrajudicial killings."). *Cabello v. Fernandez Larios,* 205 F.Supp.2d 1325, 1333 (S.D.Fla. 2002).

227. Saravia's significant involvement in Archbishop Romero's assassination, which was not authorized by any previous judgment of a court, includes the following:

- Saravia was in charge of the operation and was involved in paying the fees of the assassin. Complaint, ¶¶ 15, 19; TC Report, pp. 127, 130, 131; IACHR Decision (citing with approval the findings of the TC Report), ¶¶ 3, 20, 43, 53, 54.

- Saravia instructed his driver, Amado Garay, to drive him to a staging home. Hrg. Tr. 8/24/04 (Garay), 103:22–25; 104:1–23; TC Report, pp. 127, 130–131.

- Saravia emerged from the house with a tall man with a beard. Hrg. Tr. 8/24/04 (Garay), 105:22–106:5.

- Saravia told Garay to drive this man to an undisclosed location. Hrg. Tr. 8/24/04 (Garay), 105:9–106:3, TC Report, pp. 127, 130–131.

- Saravia said to the tall, bearded man, "It's better to shoot in the head because maybe he have [sic] a bulletproof vest. You have to be sure he got [sic] killed." Hrg. Tr. 8/24/04 (Garay), 106:7–17.

- Saravia informed Garay that they would be provided with protection, as a vehicle would be driving behind him. Hrg. Tr. 8/24/04 (Garay), 106:7–17.

- Saravia directed Garay to get into a red Volkswagen in order to drive the tall, bearded man. The man had a long rifle with a telescopic lens. Complaint, ¶ 16, Hrg. Tr. 8/24/04 (Garay), 106:13–14, 18; 20–23; 107:17; 111:12–15; TC Report, p. 127, 130–131.

- When Garay and the shooter returned to the staging house, they were greeted by Saravia who informed the shooter that he had successfully assassinated Archbishop Romero, as Saravia had heard the news on the radio that the Archbishop had died instantly. Complaint ¶ 16; Hrg. Tr. 8/24/04 (Garay), 109:20–22, 24–25; 110:1–4.

- Saravia, Nelson Morales, Nelson Garcia and Garay drove back to Saravia's house in a Jeep Cherokee, which was the vehicle regularly used for transporting Saravia. Hrg. Tr. 8/24/04 (Garay), 101:24; 115:7.

- Several days later, Saravia reported to Major D'Aubuisson, "mission completed." Complaint, ¶ 17, Hrg. Tr. 8/24/04 (Garay), 127:1–11, 16–21.

- Saravia also delivered a sum of money, which earlier had been provided to him to pay the assassin, to the assassin or his agent. Complaint, ¶ 17; TC Report, p. 127, 131.

228. Based on substantial evidence, including eyewitness testimony, the egregious and significant conduct of the defendant, Saravia makes him liable, as a direct participant, coconspirator, and aider and abettor, for the assassination of Archbishop Romero.

### (2) *Apparent Authority.*

229. Saravia acted under apparent authority and color of law of the government of El Salvador. Under Section 2(a) of the TVPA, in order to make out a claim for extrajudicial killing, plaintiff must show that Saravia acted "under actual or apparent authority, or color of law, of any foreign nation." Courts have

generally required this showing for extra-judicial killing claims under the ATC as well. *See Wiwa*, 2002 WL 319887 at \*13. To meet this definition, plaintiff must show "some governmental involvement" in the Romero assassination. *See Kadic*, 70 F.3d at 245 (quoting H.R.Rep. No. 102–367, at 5 (1991)).

230. Courts have looked to the jurisprudence of 42 U.S.C. § 1983 as a guide to determine when persons who are not themselves government officials, nonetheless act under apparent authority or color of law. Under § 1983, the standard is met when a person "acts together with state officials" or acts with "significant state aid." *Id.* Other courts have applied the virtually identical "joint action" test requiring a "substantial degree of cooperative action" between the defendant and the government. *Wiwa*, 2002 WL 319887 at \*13; *see also Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 244 F.Supp.2d 289, 328 (S.D.N.Y.2003); *Tachiona v. Mugabe*, 169 F.Supp.2d 259, 313 (S.D.N.Y.2001).

231. Here, plaintiff has demonstrated by substantial evidence that Saravia acted under apparent authority and color of law of the Salvadoran government. Specifically:

- The death squad responsible for planning and carrying out the assassination of Archbishop Romero operated "with the financial and logistical support of the Salvadoran armed forces and far right Salvadoran civilians inside and outside El Salvador." Complaint, ¶¶ 12–14; TC Report, pp. 132, 134, 137.

- In 1980, death squad operations were frequently coordinated with the El Salvador Armed Forces. The clandestine nature of their actions made it possible to cover up the state responsibility and to create a condition of total impunity for the killers. Complaint,

¶ 19; TC Report, pp. 132, 134, 137; Hrg. Tr. 8/27/04 (Karl) 80:24–25, 81:1–8.

- Death squads incorporated active members of the El Salvador state security forces in their ranks and had the support of the corresponding official institutions. Complaint, ¶ 19; TC Report, pp. 132, 134, 137; Hrg. Tr. 8/27/04 (Karl) 80:24–25, 81:1–8.

- The Salvadoran government conspired to cover up responsibility for the assassination. Complaint, ¶ 19.

- The National Police, contrary to standard operating procedure, did not provide security at the autopsy. Hrg. Tr. 8/25/04 (Ramirez Amaya), 27:5–7; 30:13–19.

- Hours after Romero's body had been taken to the Policlinica Hospital, armed soldiers in camouflage uniforms filled the chapel and surrounding areas. However, the National Police, contrary to the law and standard operating procedure, refused to assist Judge Ramirez Amaya in investigating the chapel as a crime scene later that night. Hrg. Tr. 8/26/04 (Cortina), 105:2–4; 108:10–14, 15–17, 18–19; 109:2–10; Hrg. Tr. 8/25/04 (Ramirez Amaya), 33:8–15; 34:14–17.

- The National Police attempted to murder Judge Ramirez Amaya. Ten minutes after the attempted assassination against him, a National Police inspector called Ramirez Amaya and expressed surprise that he was still alive and confirmed knowledge about the recent attempt on the Judge's life. Hrg. Tr. 8/25/04 (Ramirez Amaya), 41:21–25; 42:1–9, 10–15. Marked National Police vehicles parked on the street did not move despite the gunfire. Hrg. Tr. 8/25/04 (Ramirez Amaya), 42:24–25; 43:1–5, 7–9. A neighbor identified the man in the getaway car

as a National Policeman. Hrg. Tr. 8/25/04 (Ramirez Amaya), 43:10–25.

232. These facts more than preponderate to meet the tests of *Kadic* and *Wiwa*, that in carrying out the assassination of Archbishop Romero, Saravia acted under apparent authority and color of law of the government of El Salvador.

(3) *Plaintiff has Shown that no Legal Remedy was or is Available in El Salvador.*

▮ 233. Under the TVPA, a claimant must show that he or she has "exhausted adequate and available remedies in the place in which the conduct giving rise to the claim occurred." 28 U.S.C. § 1350, (note) § 2(b). However, when foreign remedies are "unobtainable, ineffective, inadequate, or obviously futile," exhaustion of remedies is generally not required. *Xuncax*, 886 F.Supp. at 178. *See also* S.Rep. No. 102–249, p. 9 (1991) (plaintiff in a TVPA case may rebut alleged availability of domestic remedies by showing they are "ineffective, unobtainable, unduly prolonged, inadequate, or obviously futile.") Plaintiff has established that no legal remedy was or is available in El Salvador for a civil suit against Saravia.

(i) *Inability to Bring Civil Suit Without Criminal Prerequisite Under Salvadoran Law.*

234. Plaintiff cannot obtain a civil remedy against Saravia—or any other person involved in Archbishop Romero's assassination—unless a criminal prosecution first occurs. In El Salvador, as in other civil law countries, criminal responsibility is necessary in order to obtain civil damages flowing from that conduct. Noya Decl., ¶ 2; Hrg. Tr. 8/25/05 (Ramirez Amaya), 47:6–7, 6–10; *see also* Art. 130 of the Penal Code ("any person liable for a crime or misdemeanor is also civilly liable. Any person who has suffered injury arising from a crime has the right to redress and compensation.").

235. In particular, under Salvadoran law, homicide, aggravated homicide and murder are specific intent or public actionable crimes. An action for civil liability for the killing or wrongful death of an individual can only be brought as part of the penal proceeding to investigate and prosecute such crime, and the wrongful death action may only commence upon the termination of the penal phase. Hrg. Tr. 8/25/04 (Ramirez Amaya), 47:6–10; 49:13–17; *see also* Art. 90 of the Code of Penal Procedure ("the civil action against the participants in the crime will be only brought in conjunction with the penal action.").

236. Salvadoran law permits private citizens to initiate criminal proceedings. Victims of a crime, or their relatives, may bring a private accusation for crimes subject to *es officio* proceedings. Art. 50 of the Code of Penal Procedure. As a general rule, a private attorney acting as prosecutor represents the victim and notifies the judge in writing of such representation. However, fear of reprisal and the corruption of the judicial system continue to prevent any private criminal prosecution for the Romero assassination. *See* Hrg. Tr. 8/26/04 (Hernandez), 127:6–13; 129:11–130:6 (explaining unwillingness of private attorneys to bring case). Even today private lawyers would refuse to bring a private accusation in El Salvador. Hrg. Tr. 8/26/04 (Hernandez), 130:7–10; Hrg. Tr. 8/25/04 (Ramirez Amaya), 52:8–11.

237. Similarly, beyond the failed attempt to extradite Saravia, there have been no prosecutions brought by the Salvadoran government for the assassination of Archbishop Romero. Public prosecutors are selected by the Congress. Hrg. Tr. 8/25/04 (Ramirez Amaya), 53:15–18. Congress is controlled by the ARENA

party and does not operate in an independent and nonpartisan manner. Hrg. Tr. 8/25/04 (Ramirez Amaya), 52:20–21; 53:19–54:1. In practice, public prosecutors will not even consider bringing a state case concerning the assassination. Hrg. Tr. 8/25/04 (Ramirez Amaya), 52:5–7.

238. Because there has never been a successful criminal prosecution against the killers of Archbishop Romero, and the opportunity to do so has effectively been abrogated, plaintiff has no judicial remedy in El Salvador.

(ii) *D'Aubuisson and the Salvadoran Supreme Court Actively Thwarted an Attempt to Obtain a Criminal Conviction Against Saravia.*

 239. In the one attempt to pursue a prosecution in connection with the Romero assassination, Roberto D'Aubuisson and the Salvadoran Supreme Court acted to ensure that no prosecution would result. *See* Ex. 96 ("The Saravia Extradition and the D'Aubuisson Mafia") at 1. ("There is ample circumstantial evidence that an effort is underway to obstruct the extradition from the U.S. of Cpt. Alvaro Rafael Saravia, the cashiered Salvadoran Air Force officer charged with complicity in the March 24, 1980, assassination of Archbishop Oscar Arnulfo Romero. The effort is traceable to Roberto D'Aubuisson and associates through a document telefaxed from D'Aubuisson's Mariscos Tazumal office to Saravia's U.S. lawyer for entry into the Saravia extradition court records."); *id.* at 8 ("prosecution is unlikely as long as D'Aubuisson and his backers are free to manipulate the Salvadoran judicial system.").[3]

240. The Chief Judge of the Supreme Court at the time was the same Jose Francisco Guerrero who had served as Maj. D'Aubuisson's personal lawyer and who submitted the notorious "Pedro Lobo confession" to the Fourth Criminal Court when he was the Public Prosecutor in 1985. *Id.*; Hrg. Tr. 9/3/04 (Karl), 51:11–53:1, 55:23–56:10.

---

3. D'Aubuisson's interference with the extradition process and the irregularity of the Supreme Court's decision to dismiss the charges provides a strong basis for disregarding entirely its decision to reject the testimony of Amado Garay as "not credible." The stated grounds for this decision were that (a) Garay's statement was given more than seven years after the assassination; (b) Garay's testimony allegedly conflicted with that of another witness; and (c) Garay was covering up his own involvement in the killing. Government's Motion to Dismiss Extradition Proceedings filed December 28, 1988 (attaching December 19, 1988 decision of Salvadoran Supreme Court). As a preliminary matter, the Salvadoran Supreme Court's decision has no binding effect in this proceeding as the plaintiff, J. Doe, was not a party to that case. Claim preclusion does not apply. In any event, no deference should be given to the 1988 decision because that Court never had an opportunity to see Garay testify in person and therefore was in no position to assess his credibility. In contrast, Garay testified in this court and was subject to wide-ranging questioning to test his credibility. *See Mason v. Vasquez*, 5 F.3d 1220, 1224–25 (9th Cir.1993) (emphasizing importance of trial judge's ability to see "variations in demeanor and tone of voice that bear so heavily on the listener's understanding of and belief in what is said"), citing *Anderson v. Bessemer City*, 470 U.S. 564, 573–75, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985). Furthermore, due to the differences in procedures between the two legal systems and significant questions about political interference from D'Aubuisson (*see, e.g.,* Ex. 96), neither comity nor issue preclusive effect should be given to that decision. *See, e.g., Laker Airways Ltd. v. Sabena, Belgian World Airlines*, 731 F.2d 909, 937 (D.C.Cir.1984) ("the obligation of comity expires when the strong public policies of the forum are vitiated by the foreign act"); *cf. Kremer v. Chemical Const. Corp.*, 456 U.S. 461, 102 S.Ct. 1883, 1897, 72 L.Ed.2d 262 (1982) (issue estoppel should not apply if there is reason to doubt the quality, extensiveness, or fairness of procedures followed in prior litigation).

241. The Commission found the Salvadoran Supreme Court "played an active role that served to hinder the extradition from the United States and later imprisonment of former Capt. Saravia in El Salvador." The Truth Commission determined the decision was politically motivated. Complaint, ¶ 20; TC Report, p. 131; IACHR Decision, ¶ 98.

242. No further efforts were made in El Salvador to prosecute Saravia or anyone else for the murder of Archbishop Romero. Complaint, ¶ 21.

### (iii) *The Amnesty Law Further Ensured There Would Be No Remedy For Plaintiff in El Salvador.*

243. Further ensuring that there would be no remedy in El Salvador, the Amnesty Law provided that Saravia would never face criminal or civil responsibility for the assassination. *See* Amnesty Law, Arts. 1, 4.

244. Thus, on March 31, 1993, Judge Luis Antonio Villada Figueroa applied the Amnesty Law to Saravia and dismissed with prejudice the case against him for the murder of Archbiship Romero. IACHR Decision, ¶¶ 22, 98, n. 100. Specifically, Judge Villeda found that the Romero assassination was a "political" crime which provides Saravia with amnesty under the 1993 law. IACHR Decision, ¶ 98, fn.100; Amnesty Law, ¶¶ 2, 4(c). Judge Villeda's decision was upheld by the First Criminal Chamber on May 13, 1993, which entered a final judgment in the case because the time for the Office of the Public Prosecutor to file a motion had expired without any action. IACHR Decision, ¶ 101. The First Criminal Chamber thereby ruled that its decision has *res judicata* (claim preclusive) effect with regard to Saravia in the Romero case. IACHR Decision, ¶ 22. This decision bars any criminal prosecu-tion of Saravia for the Romero assassination in El Salvador.

### (iv) *IACHR Determined That Domestic Remedies Had Been Exhausted.*

245. Art. 46(1)(a) of the American Convention requires the exhausting of domestic remedies before the "mechanisms of international protection established in the American Convention are triggered." IACHR Decision, ¶ 25. In finding that there had been exhaustion, the IACHR stated that Judge Villeda's decision applying the Amnesty Law to Saravia and dismissing with prejudice the case against him for the murder of Archbishop Romero "had the effect of deciding the instant case in the domestic jurisdiction of El Salvador. Once this domestic means of settling the matter posed is exhausted in the internal jurisdiction of El Salvador, the mechanisms of international protection established in the American Convention are triggered." IACHR Decision, ¶ 25.

246. As found by the IACHR, and based on the evidence presented at the hearing, plaintiff has met the requirements of the TVPA by establishing that domestic remedies have been exhausted or that remedies are "unobtainable, ineffective, inadequate, or obviously futile." *Xuncax,* 886 F.Supp. At 178.

### E. *Defendant Is Liable Under The ATCA.*

247. Plaintiff's claims under the ATCA were for extrajudicial killing and crimes against humanity. Complaint, ¶¶ 25, 29.

### (1) *Extrajudicial Killing.*

248. Although the ATCA does not provide a definition of extrajudicial killing, under international law, extrajudicial killing is a norm that is "specific, universal, and obligatory." It meets the require-

ments of *Sosa* to be recognized under federal law.

249. The Ninth Circuit has held that "[t]he prohibition against summary execution ... is ... universal, obligatory and definable." *In re Estate of Ferdinand Marcos, Human Rights Litig.*, 25 F.3d 1467, 1475 (9th Cir.1994) (citing *Forti*, 672 F.Supp. at 1541, *amended*, 694 F.Supp. at 710–11). The Xuncax court, relying in part on "[a]n affidavit signed by twenty-seven widely respected scholars of international law [that] attests that every instrument or agreement that has attempted to define the scope of international human rights has 'recognized a right to life coupled with a right to due process to protect that right,'" concluded that, "[a]s with official torture, the practices of summary execution, 'disappearance' and arbitrary detention have been met with universal condemnation and opprobrium." *Xuncax*, 886 F.Supp. at 185 (citing *Forti*, 694 F.Supp. at 711).

250. Congress' enactment of the TVPA, singling out torture and extrajudicial killing, confirms that extrajudicial killing provides a cause of action under federal law. *Sosa*, 124 S.Ct. at 2763, ("a clear mandate appears in the Torture Victim Protection Act of 1991 ... providing authority that 'establish[es] an unambiguous and modern basis for' federal claims of torture and extrajudicial killing ...").

251. Plaintiff has established that Saravia is liable for the extrajudicial killing of Archbishop Romero.

### (2) Crimes Against Humanity

252. In *Sosa*, the United States Supreme Court held that ATCA claims must "rest on a norm of international character accepted by the civilized world and defined with a specificity comparable to the features of the 18th-century paradigms we have recognized." 124 S.Ct. at 2761–62. The *Sosa* court identified three offenses that give rise to liability under the traditional law of nations: violation of safe conduct, infringement of the rights of ambassadors, and piracy. *Id.* at 2761. These offenses were universally accepted and defined with specificity. The Court relied on the criteria then available to Congress and the courts—the extensive practice between states and the work of scholars, including Blackstone and Vattel, to identify these norms. In addressing the modernization of the ATCA, the court cited with approval, cases which permitted ATCA claims for violations of international norms which were "specific, universal and obligatory." *Id.* at 2765. The prohibition against crimes against humanity constitutes such a specific, universal and obligatory norm.

253. The international prohibition of crimes against humanity is explicitly codified in several multilateral agreements and has been extensively litigated in international tribunals, constituting a body of doctrinal exposition. It has been exhaustively addressed in numerous scholarly treatises. The prohibition of crimes against humanity has been defined with an ever greater degree of specificity than the three 18th-century offenses identified by the Supreme Court and that are designed to serve as benchmarks for gauging the acceptability of individual claims under the ATCA.

254. The prohibition against crimes against humanity was first recognized by the Charter of the International Military Tribunal at Nuremberg ("Nuremberg Charter"). *See Restatement (Third) of the Foreign Relations Law of the United States* § 702, rpt. note 1 (1987). The Nuremberg Charter was adopted to ensure that serious human rights abuses committed during World War II by the military and political leaders of Nazi Germany were punished. *See generally* M. Cherif Bassiouni, *Crimes against Humanity in International Criminal Law* (2d ed.1999).

Under the Nuremberg Charter, acts constituting crimes against humanity included murder, extermination, enslavement, deportation, persecution on political, racial or religious grounds, or other inhuman acts committed against a civilian population. *Charter of the International Military Tribunal,* August 8, 1945, art. 6(c), 82 U.N.T.S. 284. In its final ruling on the criminal liability of Nazi leaders, the International Military Tribunal acknowledged the status of crimes against humanity under international law and convicted several defendants of this crime. *See The Nurnberg Trial,* 6 F.R.D. 69 (1946).

255. Since the adoption of the Nuremberg Charter, the prohibition against crimes against humanity has been expressly recognized in several international instruments. *See, e.g.,* G.A. Res. 95(I), 1 GAOR U.N. Doc. A/64/Add.1, at 188 (1946) (affirmation of principles set forth in Nuremberg Charter and decision of International Military Tribunal); *Convention on the Non–Applicability of Statutory Limits to War Crimes and Crimes Against Humanity,* Nov. 26, 1968, 660 U.N.T.S. 195, *reprinted in* 8 I.L.M. 68 (1969); *Principles of International Co–Operation in the Detection, Arrest, Extradition and Punishment of Persons Guilty of War Crimes and Crimes against Humanity,* G.A. Res. 3074(XXVIII), 28 GAOR Supp. (No. 30) at 78, U.N. Doc. A/9030/Add.1 (1973).

256. Recent developments affirm the status of crimes against humanity under international law. In 1993, the United Nations Security Council established the International Criminal Tribunal for the former Yugoslavia ("ICTY") to prosecute serious violations of international law committed in that territory, including genocide, war crimes, and crimes against humanity. *See State of the International Criminal Tribunal for the former Yugoslavia,* U.N. Doc. S/RES/827 (1993), *reprinted in* 32 I.L.M. 1192 (1993). The International Criminal Tribunal for Rwanda ("ICTR") was established by the Security Council in 1994 to prosecute similar violations of international law committed in Rwanda. *See Statute of the International Criminal Tribunal for Rwanda,* U.N. Doc. S/RES/955 (1994), *reprinted in* 33 I.L.M. 1602 (1994). Both statutes set forth an expanded list of enumerated offenses which are crimes against humanity, including murder.

257. Both the ICTY and ICTR have affirmed the status of crimes against humanity under international law. In *Tadic,* for example, the ICTY noted that "the customary status of the prohibition against crimes against humanity and the attribution of individual criminal responsibility for their commission have not been seriously questioned." *Prosecutor v. Tadic,* Case No. IT–94–1, (May 7, 1997), at ¶ 623. *See also Prosecutor v. Akeyesu,* Case No. ICTR–96–4–T, (Sep. 2, 1998).

258. The Rome Statute of the International Criminal Court ("Rome Statute") provides the most current definition of crimes against humanity under international law. *Rome Statute of the International Criminal Court* (July 17, 1998), *reprinted in* 37 I.L.M. 999 (1998). Article 7 of the Rome Statute defines crimes against humanity as one of a number of defined acts when committed as part of a widespread or systematic attack directed against any civilian population, with knowledge of the attack. These acts include murder, among an expanded list of crimes. Its recent codification in the Rome Statute makes Article 7 an authoritative interpretation of crimes against humanity in international law. *See generally,* Otto Triffterer, *Commentary on the Rome Statute of the International Criminal Court* (ed., 1999). The Rome statute has been ratified or acceded to by 94 countries and signed by an additional 47, including four of the five members of the U.N. Security Council,

signifying widespread acceptance. (The United States is not a signatory, however, this does not affect the analysis).

259. The Rome statute requires four elements for establish a crime against humanity: (1) a violation of one of the enumerated acts; (2) committed as part of a widespread or systematic attack; (3) directed against a civilian population; and (4) committed with knowledge of the attack. Significantly, even a single act by an individual, taken within the context of a widespread or systematic attack against a civilian population, can constitute a crime against humanity.

260. According to Antonio Cassesse, the former President of the International Criminal Tribunal for the former Yugoslavia, "when one or more individuals are ... accused ... of perpetrating specific atrocities or vicious acts, in order to determine whether the necessary threshold is met one should use the following test: one ought to look at these atrocities or acts in their context and verify whether they may be regarded as part of an overall policy or a consistent pattern of inhumanity, or whether they instead constitute isolated or sporadic acts of cruelty or wickedness." Antonio Cassesse, "Crimes against Humanity," in *I The Rome Statute of the International Criminal Court: A Commentary* 353, 361 (eds.2002); *see generally,* Darryl Robinson, *Development in International Criminal Law: Defining "Crimes against Humanity" at the Rome Conference,* 93 Am. J. of Int'l Law 43, 48 (2002). This principle was affirmed by the ICTY in *Prosecutor v. Msksic,* where the court stated:

> Crimes against humanity ... must be widespread or demonstrate a systematic character. However, as long as there is a link with the widespread or systematic attack against a civilian population, a single act could qualify as a crime against humanity. As such, an individual committing a crime against a single victim or a limited number of victims might be recognized as guilty of a crime against humanity if his acts were part of the specific context identified above.

*Prosecutor v. Msksic,* Case No. IT–95–13–R61, (Apr. 3, 1996), at ¶ 30. *See also Prosecutor v. Tadic,* Case No. IT–94–1–T, (May 7, 1997), at ¶ 649 ("Clearly, a single act by a perpetrator taken within the context of a widespread or systematic attack against a civilian population entails individual criminal responsibility and an individual perpetrator need not commit numerous offenses to be held liable.").

261. Several federal courts in the United States have accepted the well-established nature of crimes against humanity and their actionability under the ATCA. *See, e.g., Flores v. Southern Peru Copper Corp.,* 343 F.3d 140, 151 (2d Cir.2003) ("Customary international law rules proscribing crimes against humanity, including genocide, and war crimes, have been enforceable against individuals since World War II."); *Aldana v. Fresh Del Monte Produce, Inc.,* 305 F.Supp.2d 1285, 1299 (S.D.Fla.2003) ("Crimes against humanity have been recognized as violation of customary international law since the Nuremberg Trials in 1944."); *Sarei v. Rio Tinto PLC,* 221 F.Supp.2d 1116, 1150 (C.D.Cal. 2002) ("It is well-established that a party who commits a crime against humanity violates international law and may be held liable under the ATCA."); *Cabello,* 157 F.Supp.2d at 1360–61 ("[T]he ruling of the Nuremberg Tribunal memorialized the recognition of 'crimes against humanity' as customary international law."); *Iwanowa v. Ford Motor Co.,* 67 F.Supp.2d 424, 440 (D.N.J.1999) (recognizing crimes against humanity as a violation of international law); *Quinn v. Robinson,* 783 F.2d 776, 799 (9th Cir.1986) ("crimes against humanity, such as genocide, violate international law"). *See also United States v. Yousef,* 327 F.3d 56, 105 (2d Cir.2003) ("Following

the Second World War, the United States and other nations recognized 'war crimes' and 'crimes against humanity,' including 'genocide,' as crimes for which international law permits the exercise of universal jurisdiction"); *Sosa*, 124 S.Ct. at 2783 (Breyer, J., concurring) (recognizing that international law views crimes against humanity as universally condemned behavior that is subject to prosecution).

262. In particular, several U.S. courts have referenced the specific, universal, and obligatory nature of crimes against humanity in their rulings on ATCA liability. In *Mehinovic*, the district court applied the "specific, universal and obligatory" test and held that crimes against humanity are actionable under the ATCA. 198 F.Supp.2d at 1344, 1352–54. The district court in *Wiwa*, also followed this approach, analyzing several ATCA claims under the "specific, universal and obligatory" standard and holding the prohibition of crimes against humanity to be "a norm that is customary, obligatory, and well-defined in international jurisprudence." 2002 WL 319887 at *5, 9, 27.

■■■ 263. These cases demonstrate that crimes against humanity constitute a specific, universal, and obligatory norm and that this norm is actionable under the ATCA. The assassination of Archbishop Romero meets the elements for establishing a crime against humanity. The Romero assassination occurred in an environment of state-sanctioned violence that was both widespread throughout El Salvador and constituted systematic, inhumane attacks on the civilian population by the ruling military. The death squad which perpetrated the murder of Archbishop Romero acted as part of a calculated strategy by the military to terrorize the civilian population into submission. The decision to kill Romero was implemented to silence his criticism of the state security forces and state implemented repression. At or

about the same time other priests were being murdered by the military and death squads to deter their practice of liberation theology.

264. Saravia knew that he was involved in an operation to commit the murder of one of the most important civilians in El Salvador, its revered Archbishop. Given that this particular act took place within the context of other widespread and systematic attacks against the civilian population by state security forces and state-sponsored death squads, the assassination of Romero meets the four criteria for establishing it as a crime against humanity.

265. This extrajudicial killing meets the Supreme Court's requirements identified in *Sosa*.

(3) *No Exhaustion of Remedies Requirement Under ATCA.*

■■■ 266. Plaintiffs asserting claims under the ATCA are not required to exhaust their remedies in the state in which the alleged violations of customary international law occurred. *See Abiola v. Abubakar*, 267 F.Supp.2d 907, 910 (N.D.Ill. 2003); *Sarei*, 221 F.Supp.2d at 1132–35 ("The court is not persuaded that Congress' decision to include an exhaustion of remedies provision in the TVPA indicates that a parallel requirement must be read into the ATCA.") (*citing Kadic*, 70 F.3d at 241). *See also Jama v. I.N.S.*, 22 F.Supp.2d 353, 364 (D.N.J.1998) ("There is nothing in the ATCA which limits its application to situations where there is no relief available under domestic law.").

267. In *Kadic*, which the *Sarei* court cited, the Second Circuit held that "[t]he scope of the Alien Tort Act remains undiminished by enactment of the Torture Victim Act." 70 F.3d at 241. The *Kadic* court did not apply the TVPA exhaustion of remedies requirement to the plaintiffs' ATCA claims for torture and summary execution, even though plaintiffs asserted

the same claims under the TVPA. *Id.* at 243–44.

268. The Supreme Court in *Sosa* noted in *dicta* that exhaustion of remedies available in the foreign domestic legal system may be necessary under the ATCA in "an appropriate case." 124 S.Ct. at 2766, n. 21. However, the court did not elaborate on the issue and did not disavow the Second Circuit's ruling. As plaintiff's claims for extrajudicial killing and crimes against humanity are brought under the ATCA and customary international law, plaintiff need not show that plaintiff has exhausted remedies in El Salvador, which exhaustion has been determined to be futile.

### F. *Plaintiff is Entitled to Damages Under the TVPA and the ATCA.*

269. Courts have awarded significant compensatory and punitive damages for extrajudicial killing under the TVPA. *See, e.g., Tachiona,* 216 F.Supp.2d at 267–68. In that case, the Court awarded $2.5 million for consistency with next pages in compensatory and $5 million in punitive damage for extrajudicial killing. In reaching that decision, the Court cited the following awards of other courts: *Mushikiwabo v. Barayagwiza,* No. 94 Civ. 3627, 1996 WL 164496, at *3 (S.D.N.Y. Apr.9, 1996) (awarding compensatory damages including $500,000 in pain and suffering and awarding $1 million in punitive damages to each relative of a victim and $5 million to each victim for torture and murder under the TVPA and ATCA); *Mehinovic,* 198

F.Supp.2d at 1358–60 (awarding $10 million in compensatory and $25 million in punitive damages to each victim for torture, cruel and inhumane treatment, arbitrary detention, violations of the law of war and crimes against humanity under both the TVPA and ATCA as well as assault and battery, false imprisonment, intentional infliction of emotional distress and conspiracy under Georgia law).

270. Courts have also awarded significant compensatory and punitive damages for violations of the ATCA, including extrajudicial killing and crimes against humanity.[4] Previous courts have awarded the following:

- *Filartiga* (awarding $5 million each in punitive damages to the father and sister of Joelito Filartiga, who was tortured to death by Paraguayan officials; court also awarded $350,000 in compensatory damages);
- *Xuncax* (awarding $7 million in compensatory and punitive damages to each of the three plaintiffs asserting a claim for extrajudicial killing);
- *Mushikiwabo* (awarding between $10 million and $35 million in compensatory and punitive damages to each plaintiff suing for the extrajudicial killing of a number of relatives during massacres in Rwanda);
- *Trajano v. Marcos (In re Estate of Ferdinand E. Marcos Human Rights Litigation),* 978 F.2d 493 (9th Cir. 1992) (awarding $4.16 million in compensatory and punitive damages and

---

4. If a choice of law analysis is necessary to determine the applicability of punitive damages, this Court may look to the law of El Salvador, but only to the extent it does not frustrate the very purpose of the ATCA. *See Tachiona,* 234 F.Supp.2d at 419 (choice of law determination should not compel "dispositive application of foreign law where the municipal rule of decision may conflict with federal law or international standards"); *see also Filartiga v. Pena–Irala,* 577 F.Supp. 860, 863–64 (E.D.N.Y.1984) ("the court should consider the interests of Paraguay to the extent they do not inhibit the appropriate enforcement of the applicable international law or conflict with the public policy of the United States"). Salvadoran law does support awards of "moral damages," which are tantamount to punitive damages under U.S. law. *See* Noya Decl. at ¶¶ 19–21. Therefore, even under a choice of law analysis, plaintiff is entitled to punitive damages.

attorneys fees for torture and extrajudicial killing);

- *Tachiona* (awarding undifferentiated damages under both the TVPA and the ATCA in the amount of $7.5 million in compensatory and punitive damages for each of three claims of extrajudicial killing); and

- *Cabello v. Fernandez–Larios*, No. 99–0528–CIV–LENARD (S.D.Fla. Oct.31, 2003) (following a jury trial, an award of $4 million was entered in favor of plaintiffs for a single claim of extrajudicial killing and crimes against humanity).

271. These decisions have awarded damages on the basis of the following factors:

i. Brutality of the act;

ii. Egregiousness of defendant's conduct;

iii. Unavailability of criminal remedy;

iv. International condemnation of act;

v. Deterrence of others from committing similar acts;

vi. Provision of redress to plaintiff, country and world.

272. For all the reasons discussed, these factors support the award of substantial damages in this case. In many ways, this case is different from any other because of the national and international stature of the victim, his importance to any effort to avoid war, and the violence that followed his death. Archbishop Romero was widely recognized as the one person who could act as a bridge between the divided sectors of Salvadoran society and was seen by the U.S. government and many others as absolutely crucial to any nonviolent or less-violent resolution of the crisis gripping El Salvador at the time. With his death and the elimination of the bridge between the polarized sectors of Salvadoran society, El Salvador descended into civil war.

273. Plaintiff has suffered a loss only partially compensable in money and is entitled to significant compensatory and punitive damages, in the respective amounts of $5 million and $5 million for a total damage award of $10 million.

## V. CONCLUSION

274. For all reasons stated, plaintiff is entitled to judgment on the claim of extrajudicial killing under the TVPA and on the claims of extrajudicial killing and crimes against humanity under the ATCA, in the total amount of $10 million against defendant, Saravia, plus his costs of suit.

275. The Redacted Findings of Fact and Conclusions of Law shall be `filed.

276. The Unredacted Findings of Fact and Conclusions of Law shall be filed UNDER SEAL.

SO ORDERED.